FIDELITY ASSURANCE ASSOCIATION ET AL. *v.* SIMS, AUDITOR OF THE STATE OF WEST VIRGINIA, ET AL.

No. 319.   Argued February 9, 10, 1943.—Decided April 5, 1943.

*Mr. Homer A. Holt,* with whom *Messrs. James R. Fleming, John V. Ray,* and *T. C. Townsend* were on the brief, for petitioners.

*Mr. John F. Davis,* with whom *Solicitor General Fahy* and *Messrs. Richard S. Salant, Homer Kripke,* and *Justin N. Reinhardt* were on the brief, for the Securities & Exchange Commission; *Mr. H. Vernon Eney,* with whom *Mr. Guy B. Brown* was on the brief, for John B. Gontrum, Insurance Commissioner of Maryland; *Mr. Rickard H. Lauritzen,* Assistant Attorney General of Wisconsin, with whom *Messrs. James Ward Rector,* Deputy Attorney General, *Carl J. Stephens,* and *Ben C. Buckingham* were on the brief, for the Banking Commission of Wisconsin et al.; *Mr. Fyke Farmer,* with whom *Messrs. Nat Tipton,* Assistant Attorney General of Tennessee, *Weldon B. White,* and *Rudolph K. Schurr* were on the brief, for L. H. Brooks, Trustee, et al.; and *Mr. J. Campbell Palmer, III,* with whom *Mr. Ira J. Partlow* was on the brief, for Edgar B. Sims, Auditor of West Virginia, et al.,—respondents.

*Mr. Harry L. Deibel* filed a brief on behalf of Victor Salkeld et al., as *amici curiae,* urging reversal. A joint brief as *amici curiae* was filed on behalf of the States and state officials of Alabama, California, Delaware, Illinois, Indiana, Kansas, Kentucky, Louisiana, Nebraska, North Dakota, Ohio, Oregon, Texas, Utah, and Washington, and the state court receiver of Virginia, urging affirmance.

Mr. Justice Roberts delivered the opinion of the Court.

This case presents important questions concerning the construction of Chapter X of the Bankruptcy Act.[1]

---

[1] Act of June 22, 1938, 52 Stat. 840, 883; 11 U. S. C. §§ 501–676, inclusive.

Many states of the Union are interested because of the asserted incidence of its provisions upon state laws and rights thereby created. A number of state officers are parties.

Fidelity Assurance Association, a West Virginia corporation, filed its petition for reorganization in the District Court for Southern West Virginia. The Judge made an order approving the petition as properly filed. He also entered orders enjoining state officials from dealing with property held by them.[2]

State banking and insurance commissioners and state court receivers answered, asserting that the debtor could not avail itself of the Act because it was an insurance company,[3] and that, in any event, the petition was not filed in good faith, as the phrase is defined in § 146 (3) (4) of Chapter X.[4] The Securities and Exchange Commission intervened at the request of the District Court. After trial of the issues, the court formally approved the petition and overruled the motions to rescind the decrees granting injunctions.[5] The Circuit Court of Appeals reversed.[6]

The debtor was organized April 11, 1911, under the name of Fidelity Investment and Loan Association. Its corporate purposes were enlarged in 1912 to include the soliciting and receiving of payments on annuity contracts. Thereby it became subject to the provisions of

---

[2] An appeal was taken from the District Court's refusal to rescind the orders. The Circuit Court of Appeals refused to disturb them at that stage of the proceeding. *Sims* v. *Central Trust Co.*, 123 F. 2d 89.

[3] Act of July 1, 1898, c. 541, § 4, 30 Stat. 547, as amended, 11 U. S. C. § 22.

[4] 11 U. S. C. § 546.

[5] 42 F. Supp. 973.

[6] 129 F. 2d 442.

Art. 9 of Ch. 33 of the Code of West Virginia,[7] relating to the selling of annuity contracts and, as therein provided, to the supervision of the Auditor, as ex-officio Insurance Commissioner of the State.

From December 1912 to the close of 1940, the company's business was the selling of investment contracts and for this purpose it was licensed in many states. It altered its contracts from time to time, but in general they consisted of certificates evidencing the agreement of the purchaser to make specified periodic payments and the company's agreement that upon the expiration of a stipulated term it would return to him in instalments a sum designated as the face amount, or pay a lump sum less than the face amount.

During the six years preceding December 30, 1940, the debtor sold a contract having a collateral insurance feature provided by a blanket policy procured by Fidelity from Lincoln National Life Insurance Company. Approximately seventy-five per cent of the contracts issued after 1934 contained this feature.

It will be seen that the business was essentially the conduct of a compulsory savings plan. The interest paid a certificate holder was at a low rate and the penalty for failure to keep a certificate alive was heavy. The expense of selling the contracts was inordinately high and, in spite of a large volume of sales, the company was constantly falling behind and suffering serious losses.

The present Insurance Commissioner of West Virginia took office in 1933. It was his duty to require and approve the deposit with the State Treasurer of bonds and securities to be held in trust for the benefit of the company's West Virginia contract holders to an amount equal

[7] Michie's W. Va. Code 1937, p. 1204 ff. This Article was repealed by chapter 46, § 12, Acts of West Virginia, 1941, effective ninety days from March 8, 1941, but this fact is irrelevant to any issue in this case.

to the cash liability to them; to require a similar deposit in trust for the benefit of holders located in other states to the extent that the laws of such states did not provide for a deposit equal to, or greater than, that called for by the laws of West Virginia. Shortly after taking office, the Commissioner discovered that the company was insolvent. There is a long history of negotiations and requirements, extending almost to the time of filing the petition, in an effort to restore it to a solvent condition.

The company was at one time licensed in twenty-nine states, each of which had laws regulating its business. Fifteen required a deposit of approved investment obligations with some state official to secure payment of outstanding contracts held by residents; the remainder had no such requirement, but the contracts sold in these states were secured by the deposit made with West Virginia.[3] As of the date of the filing of the debtor's petition, the deposits made with various states, including West Virginia, amounted, according to the debtor's figures, to $20,056,680.27, against a net reserve liability of $24,221,-651.36. In addition, the company had securities, not deposited anywhere, valued at $556,467.51, most of which were ineligible for deposit under the laws of any state; and $500,000 in cash.

Each of the series of contracts sold by Fidelity embodied provisions for the creation and maintenance of a reserve fund. All of the contracts provided that the reserve fund maintained by the company should be invested in approved securities and deposited in trust as required by the laws of West Virginia. Securities purchased with the moneys paid by the contract holders were deposited with the Treasurer of West Virginia and officials of other states in compliance with their respective laws, but no effective

---

[3] The security afforded by these laws was stressed by sales agents and was effective in the procurement of contracts.

effort was made to designate the source of the funds with which securities were purchased so as to identify the latter as belonging to the reserve of any series, nor did the state authorities make any such allocation. The securities on deposit with the states were at all times treated by the debtor, and state authorities, as securing all obligations to contract holders in the state where each deposit was made, and reports by the company to the states respecting total liabilities failed to show such liabilities by funds or series. There were certificate holders in all forty-eight states, the District of Columbia, and foreign countries.

December 14, 1938, the Securities and Exchange Commission sought an injunction in a federal court, alleging the company was engaged in acts and practices violative of the fraud provisions of § 17 (a) of the Securities Act of 1933.[9] This suit resulted in an injunction; and was followed by another for appointment of a receiver in a federal court in West Virginia, which was dismissed.[10]

Prior to 1938 the debtor had made efforts to obtain fresh capital to be used in reorganizing its business. After 1938 the effort was continuous, but no capital was forthcoming.

Despite enormous sales,[11] the company could not attain a solvent position. Moreover, the publicity ensuing the two suits resulted in the surrender of many contracts, the temporary suspension of the sale of new certificates, and a serious diminution of sales when activity was resumed.[12]

Pursuant to the Public Utility Holding Company Act of 1935,[13] the Securities and Exchange Commission con-

---

[9] Act of May 27, 1933, c. 38, Tit. I, § 17, 48 Stat. 84, 15 U. S. C. § 77q.

[10] *McCammon* v. *Fidelity Investment Assn.*, 26 F. Supp. 117, affirmed *Hutchinson* v. *Fidelity Investment Assn.*, 106 F. 2d 431.

[11] The gross business written in 1938 was $52,000,000.

[12] Sales in 1940 were $12,000,000.

[13] Act of August 26, 1935, c. 687, Tit. I, § 30, 49 Stat. 837, 15 U. S. C. § 79z–4.

ducted an investigation and reported its findings respecting Fidelity's business and other matters to Congress on March 13, 1940. As a result, the Investment Company Act of August 22, 1940,[14] was adopted. Fidelity's officers and directors realized that the company could not meet the statutory requirements and survive. They therefore cast about for some other business to which the corporate resources might be devoted. They hit upon life insurance.

Accordingly, on December 31, 1940, the debtor amended its charter. The amendment changed its name to Fidelity Assurance Association, eliminated the existing corporate powers and purposes, and adopted as the corporate purpose "to issue insurance upon the lives of persons and every insurance appertaining thereto and connected therewith, and to grant, purchase, and dispose of annuities." In January 1941, by charter amendment, the authorized capital stock was altered in order to qualify the company to transact a life insurance business in West Virginia and elsewhere. The company also registered under § 8a of the Investment Company Act, supra, so that it might continue to service outstanding contracts. The Insurance Commissioner of West Virginia issued a license for the conduct of an insurance business, but with the understanding that no such business should be written until the company's affairs had been put into satisfactory order. Notwithstanding this arrangement, the company, by written negotiations, procured some 9,800 of its certificate holders to accept an amendment of their outstanding certificates providing an insurance obligation on the part of the company.

At the instance of the Insurance Commissioner, the Attorney General of West Virginia, on April 11, 1941, instituted proceedings for the appointment of a receiver in the

---

[14] c. 686, 54 Stat. 789, 15 U. S. C. § 80a-1 et seq.

Circuit Court of Kanawha County. The company entered an appearance but interposed no answer or objection. The court appointed receivers who took over the cash and undeposited securities but did not essay to obtain possession of the assets on deposit with the Treasurer of West Virginia or with officials of other states. The authorities of the various states were notified of the pendency of this suit. Thereafter, proceedings were instituted or steps taken by state officers, pursuant to state law, for the liquidation of the company's obligations to local certificate holders in Wisconsin, Iowa, Ohio, Illinois, Tennessee, Missouri, Indiana, Kentucky, Maryland, and Pennsylvania.

The respondents, other than Securities and Exchange Commission, contended below, and urge here, that the petition should be dismissed, since (1) the debtor is an insurance company exempted from the provisions of the Bankruptcy Act, (2) the petition was not filed in good faith. The debtor, the trustee appointed under Chapter X, and the Commission, successfully opposed these contentions in the District Court. The Circuit Court of Appeals held with the respondents on both grounds. We find it unnecessary to consider or decide whether, at the date of filing, the debtor was an insurance company within the meaning of the Act, for we think the Circuit Court of Appeals was right in holding the petition not filed in good faith as the phrase is defined in § 146 (3) and (4).

Section 144 [15] requires that if the judge is not "satisfied" that the petition "has been filed in good faith" he shall dismiss it. The relevant portions of § 146 [16] are that "a petition shall be deemed not to be filed in good faith if . . . (3) it is unreasonable to expect that a plan of reorganization can be effected; or (4) a prior proceeding is

---

[15] 11 U. S. C. § 544.
[16] 11 U. S. C. § 546.

pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding."

As the court below has said, in applying the statutory test the situation should be viewed realistically. If this be done, we think the rejection by the court below of the claim of the debtor and its trustee that it can be reorganized as a going concern must be affirmed. In appraising the soundness of this claim, certain facts additional to those already noticed must be kept in mind. On April 10, 1941, there were 87,999 contracts outstanding for a face amount of $181,948,026.70. At that time, liabilities exceeded assets, on the company's showing, by $2,500,000. The business written in 1940 had shrunk to 23% of that written in 1938. The company had been losing money at the rate of $250,000 per annum. Its sale of investment certificates had ceased December 30, 1940, and, even if it had been possible to resume this activity in compliance with the requirements of the Investment Company Act, the reëstablishment of the sales force would have cost $500,000.

In the light of all relevant facts, it seems clear that Fidelity cannot be reorganized for the purpose of conducting its old business of selling investment certificates. Conviction that this was so led its managers to attempt to alter its corporate purposes to those of a life insurance company. The District Judge said: "It is true that the broad picture developed by the testimony at the hearing does not present a very favorable view with respect to the rehabilitation and continued operation of the debtor as a face amount certificate company." And he added: "It is extremely doubtful whether, in view of unsettled economic conditions and the critical international situation, the Fidelity plan would any longer appeal to a large public; but it is not impossible; and it is not the duty of the court to decide for the public that investors will not or should not buy these contracts in the future."

There is no prospect that the debtor can be reorganized as an insurance company, and the District Judge did not find that it could.

The petitioners say: "Upon this record, can it be said that it is unreasonable to expect that some insurance or investment company can be found to take over or buy the assets of Fidelity under a contract for the benefit of the Fidelity contract holders, to issue them investment certificates or insurance policies, of one or more kinds of greater value than the dividends to such contract holders through the liquidation of Fidelity would buy?"

The court below properly concluded that "the possibility that thousands of contract holders could be persuaded to modify their contracts and scale down their claims [17] to enable the company to go on is so remote as to exist only in the imagination."

Petitioners and Securities and Exchange Commission urge, however, that Chapter X may be employed to accomplish a slow and orderly liquidation which they say is imperative in the interest of all creditors. The District Court so held.

It must be remembered that Fidelity is admittedly insolvent and no one suggests there is any equity in its stock; that there is one greatly preponderant class of creditors,—certificate holders—all having security for their claims on one or more deposits with state authorities, and all having unsecured claims against the unpledged assets of the debtor. The necessity for decision as to the relative rights of these classes in pledged assets may present difficult questions of distribution, but has little, if any, bearing upon the method of turning the debtor's assets into money.

The deposited securities are generally readily marketable at favorable prices. They are scattered through

[17] The claims average less than $273 each.

fifteen states, in hands of public officials whose duty it is to liquidate them on terms most favorable to those for whose protection they stand pledged. The suggestion that these quasi-trustees will force the securities on the market without regard to its ability to absorb them, to the destruction of their beneficiaries' security, is inadmissible, and, in addition, is contrary to what occurred after the institution of the West Virginia receivership. There is no foundation for the position that the so-called reorganization should take the form of the creation of a new corporation to which all these securities would be transferred for conversion into cash, particularly as the advocates of such a project admit that the application of the security afforded classes of certificate holders according to state law cannot be avoided in any distribution of assets.

It is urged that a plan of liquidation may constitute a reorganization under Chapter X, and decisions are cited to that point,[18] but an examination of them will demonstrate that in none save where the corporate purpose of the debtor was, in effect, holding and liquidating securities was the plan such as is proposed here. Under the facts of this case, the suggested plan is but an alternative for ordinary bankruptcy, without any readjustment of the rights of creditors and stockholders *inter se,* and this fact serves to distinguish the remaining cases on which reliance is placed.

We conclude that, in this aspect, good faith, in the statutory sense, is lacking, since no such reorganization as the statute was intended to accomplish is reasonably to be expected.

---

[18] *In re Central Funding Corp.,* 75 F. 2d 256; *In re Mortgage Securities Corp.,* 75 F. 2d 261; *Continental Ins. Co.* v. *Louisiana Oil Rfg. Corp.,* 89 F. 2d 333; *R. L. Witters Associates* v. *Ebsary Gypsum Co.,* 93 F. 2d 746; *In re Porto Rican American Tobacco Co.,* 112 F. 2d 655.

In the second place, we hold that the interests of creditors would be best subserved in the pending prior proceedings in West Virginia and other states. The court below was of this opinion for these reasons: It appears unlikely that there will be any surplus after payment of local claimants in any state other than West Virginia; state law must govern the distribution of the respective deposits; creditors can as readily present claims against the surplus of the West Virginia deposit in the West Virginia court as in the federal court in this proceeding.

The Securities and Exchange Commission insists that the Chapter X proceeding is more advantageous as affording opportunity for impartial investigation of wrongdoing by company officers, and the solution of problems of marshalling and distribution. If, as the court below held, nothing is to be accomplished but the liquidation of Fidelity, it is difficult to see why that process and consequent distribution of the proceeds should be held up by the search for causes of action against officers and directors. Nor is any convincing showing made that such investigation cannot, or will not, be made and availed of by the state court receivers. Moreover, if Fidelity is not an insurance company, it could have been put into ordinary bankruptcy, orderly liquidation accomplished, and impartial investigation made by a trustee elected by the creditors.

There are no true problems of marshalling presented. Creditors in the various states will unquestionably go first against the local deposits. They may, or may not, be paid in full from those funds. They will have claims against the surplus of the West Virginia fund for any deficiency. On the other hand, a surplus in a state fund after satisfaction of local creditors, will be added to the surplus fund in West Virginia for the benefit of all having claims against it. Rights against local deposits will be adjudicated by the courts of the states, near the homes

of the beneficiaries and at a minimum of inconvenience, delay, and expense. The advantages of bringing all these funds to the District Court for administration in conformity to diverse state law, and compelling claimants to come there to assert their rights, are not apparent.

It is said, however, that Fidelity agreed to segregate the reserve fund of each series, and that the holders of certificates in any series are entitled to have the securities purchased for the reserve of that series traced and set apart for their benefit, and that this can be done only in the present proceeding by bringing all the funds under a single administration.

Without reciting the facts in detail, it is enough to say that, while the different reserve funds were separately set up on the books of the company, they were, for the greater part of the period in question, kept in a single bank account, and the securities purchased for the various reserve funds were not earmarked as such. Moreover, for the most part, securities deposited with state authorities were not, at the time of the deposit, designated as belonging to the reserve fund for any series of contracts. In some instances, designations of them were made subsequent to their deposit. In addition, it is to be noted that under the law of West Virginia, and that of other states having deposits, the securities deposited are made a common fund for the protection of all outstanding contracts, and the certificate holders were advised by the company in its literature that it proposed to deposit reserve fund securities in accordance with the law of the states. The situation discloses so many difficulties of law and fact as to render segregation for purposes of distribution of the avails of the securities improbable. And the smallness of the average amount due certificate holders indicates that the expense of the effort, if successful, would, in the end, prove more detrimental to a claimant than foregoing the trifling advantage of a reallocation of securities to the respective reserve funds.

It was suggested at the bar that, even if liquidation is all that can be hoped, this would be better managed by a single bankruptcy court than in several separate proceedings. The difficulty with the suggestion is that Congress did not intend resort to Chapter X to be had for the mere purpose of liquidation. The scheme of the chapter precludes any such conclusion. The mandate of § 144 is clear that unless the judge is satisfied the petition was filed in good faith he must dismiss it. Under the predecessor of Chapter X—§ 77B of the Bankruptcy Act—the district judge was given authority, by subsection (c) (8),[19] under certain circumstances, to "direct the estate to be liquidated, or direct the trustees to liquidate the estate . . ." In Chapter X, on the other hand, § 236 (2)[20] provides that if no plan is approved or accepted, or if it is not consummated, the judge may, after hearing all persons in interest, adjudge the debtor a bankrupt or dismiss the proceeding, as he may decide is in the interest of creditors and stockholders. Thus the statute does not contemplate a liquidation in a Chapter X proceeding but a liquidation in ordinary bankruptcy or a dismissal outright.

If the liquidation of Fidelity's affairs in bankruptcy had been proposed at the start, the petition in bankruptcy could not have been filed in the District Court for the Southern District of West Virginia, in which this proceeding is pending. A Chapter X proceeding may, under § 128,[21] be initiated either at the principal place of business of the corporation or where it has its principal assets. The present proceeding was initiated in the Southern District on the ground that the principal assets of the company are located at Charleston in that district, in the possession of the State Treasurer. Under § 2 of the Bank-

---

[19] 11 U. S. C. § 207 (c) (8).

[20] 11 U. S. C. § 636 (2).

[21] 11 U. S. C. § 528.

ruptcy Act,[22] an ordinary bankruptcy may be initiated only at the corporation's principal place of business, which is Wheeling, in the Northern District of West Virginia.

Congress did not intend a Chapter X case to be turned into a liquidation proceeding at the outset, but intended the litigation to become a straight bankruptcy only after the failure to consummate a plan, and meant to limit the parties to their remedy in ordinary bankruptcy in all other cases. It would, therefore, be a perversion of the Congressional intent to treat the present as a liquidation proceeding, since the rights of persons having liens or security pledged for their claims differ widely in the two sorts of bankruptcy.

The judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.