In the Matter of **RICE-VARICK HOTEL, INC.**, Debtor.

**Bankruptcy No. 6201.**

United States District Court
D. New Hampshire.
June 11, 1959.

Robert D. Branch, Concord, N. H., Harold E. Wescott, Laconia, N. H., for Armand E. Lemire, Inc., M. H. Parsons & Sons Lumber Co., Inc., and Ray G. Goodman, on the petition in proceedings under Chapter X.

Fisher, Parsons & Moran, Dover, N. H., for Rice-Varick Hotel, Inc.

CONNOR, District Judge.

This is a petition filed by three unsecured creditors of the bankrupt, Rice-Varick Hotel, Inc., to reorganize the corporation pursuant to Chapter X of the Bankruptcy Act (11 U.S.C.A. Chap. X, §§ 501-675).

---

9. Fricke v. Isbrandtsen Co., D.C.S.D.N.Y. 1957, 151 F.Supp. 465. Cf. Jansson v. Swedish American Line, 1 Cir., 1950, 185 F.2d 212.

The Rice-Varick Hotel, Inc., was adjudicated a bankrupt on February 24, 1959, following an involuntary petition. On April 6, 1959, the real estate of the bankrupt was sold pursuant to a sheriff's sale held to execute certain mechanics' liens on the property. The real estate was sold subject to an equity of redemption (RSA 529:26) for $140,000 subject to a first mortgage and tax liens of approximately $80,000. The purchase price is the subject of litigation in the State Superior Court and the sale itself is also assailed in the state court as being invalid. The $140,000 in litigation and the equity of redemption constitute the principal assets of the bankrupt. To complicate matters further, a dispute as to the ownership of the stock of the hotel is the subject of litigation in this court and in the Supreme Court of New Hampshire.

Numerous hearings on this petition were had, the financial condition of the bankrupt was examined, and a plan of reorganization was suggested.

■ Upon all the evidence, it is concluded that the petition should be dismissed because it was not brought in good faith within the meaning of sections 143 and 146(3) of the Bankruptcy Act (11 U.S.C.A. §§ 543, 546(3)).

■■ The real motivating force behind this petition appears to be not the three unsecured petitioning creditors, but rather one of the groups of alleged shareholders litigating for control of the stock. Probably none of the petitioning creditors would have signed the petition were it not for the fact that one of the litigating shareholders and his counsel solicited their signatures. While this alone would not conclusively establish bad faith (Humphrey v. Bankers Mortgage Co., 10 Cir., 79 F.2d 345, 351), taken with further reasons given below, it constitutes an invocation of Chapter X for a purpose patently not within the purview or intent of the Act. The dispute between shareholders will scarcely promote the conditions necessary for a fiscal recovery. Where the only purpose of the petition appears to be to adjust rights between classes of stockholders alone, the petition must be dismissed. In re Piccadilly Realty Co., 7 Cir., 78 F.2d 257.

The second consideration is the fact that the bankrupt hotel is hopelessly insolvent. At best, a reorganization could result only in a postponed liquidation. The debts of the hotel cannot be determined accurately at this point, but they range from a total of $504,766.38 on one group's figures to $700,000 to $800,000 on the other group's figures. This latter estimate seems more realistic because many of the obligations disclaimed by the first group are notes for which the officers of the hotel personally signed. Apparently on account of the poor credit of the hotel, the creditors required this personal liability. The goods were used for the hotel and in all probability are debts of the hotel, but this is not now decided. Although the balance sheet of the hotel on May 31, 1958, showed total assets of $735,233.70, the building and land was sold at the sheriff's sale of April 6, 1959, for $140,000 subject to an $80,000 first mortgage and tax liens. Even assuming that a 10% net profit could be earned on the assets as valued on May 31, 1958, it would take roughly ten years to pay off all the debts, not even considering interest and the cost of reorganization. This assumes an annual net income of some $75,000. In estimating whether such a profit is probable, it should be noted that the deficit on May 31, 1958, was $168,049.68. There is evidence that the hotel has made a profit of some $25,000 for the period from July to November, 1958, before depreciation, but depreciation at the rate of $17,000 a year would cut this profit down to under $20,000. The financial picture is so hopeless that "it is unreasonable to expect that a plan of reorganization can be effected" within the meaning of section 146(3). Evaluating liabilities at $700,000, about the only assets now available are $140,000 paid by the purchasers at the sheriff's sale and now the subject of litigation among shareholders in the

State Superior Court, plus an equity of redemption. "Chapter X contemplates rehabilitation rather than liquidation of the debtor." Collier, page 727, volume 6. See also, Fidelity Assurance Ass'n v. Sims, 318 U.S. 608, 63 S.Ct. 807, 814, 87 L.Ed. 1032, "Congress did not intend a Chapter X case to be turned into a liquidation proceeding at the outset."

The plan of reorganization suggested affords no escape from this fiscal jungle. Although a reorganization plan need not now be fully worked out, it is essential to show that a reasonable plan may be forthcoming. Manati Sugar Co. v. Mock, 2 Cir., 75 F.2d 284. The plan suggested is this: Financial backers would put up not more than $280,000, provided they may be secured by a first mortgage and provided the stockholders are satisfactory to them. It is proposed that this money would be used to exercise the equity of redemption and get back the hotel. This plan well might simply increase the total debt of the corporation rather than decrease it appreciably. Furthermore, it is uncertain either that the investors would ever agree that the stockholders were satisfactory to them or that the creditors would agree to be subject to another large mortgage. The investors concede that it would be unwise to add $280,000 to the debt unless the existing debt were reduced by agreement of the creditors. There is no evidence that this consent would be forthcoming, at least from the secured creditors. If a plan were approved, not more than $60,000 additional cash could be available to creditors. But, deducting from this the costs of reorganization, it can hardly be disputed that much more than this net figure could be obtained by selling the equity of redemption at auction through regular bankruptcy proceedings.

Moreover, there are so many secured creditors that the petitioning unsecured creditors would have no hope of reaching the $60,000 without the consent of the secured creditors.

An order dismissing the petition will be entered.