In the Matter of IMPERIAL "400" NATIONAL, INC., a Delaware corporation, Bristol Financial Corporation, a New Jersey corporation, Imperial "400" Corporation, a Nevada corporation, Imperial "400" Land Corporation, a Delaware corporation, Motor Hotel Properties, Inc., a New Jersey corporation, Trans-National Development Corporation, a New Jersey corporation, Four Hundred Construction Corporation, a Delaware corporation, National Motel Construction Company, a California corporation, and Trans-World Motel Supply Corporation, a California corporation, Debtors.

No. B 656–65.

United States District Court
D. New Jersey.
Jan. 31, 1966.

See also D.C., 274 F.Supp. 351.

Sidney Lapidus and Donald L. Roth, New York City, for Securities and Exchange Commission.

Myron S. Lehman, Morris Ravin, Ravin & Ravin, Newark, N. J., Nelson G. Gross, Gross & Gross, Hackensack, N. J., for debtors.

Sanford Silverman, Newark, N. J., for receiver.

McCarter & English, by James H. Bennett, Newark, N. J., for Ohio Citizens Trust Co. and Lincoln National Life Insurance Co.

Sullivan & Cromwell, by Lester L. Cooper, Jr., New York City, Hannoch, Weisman, Myers, Stern & Besser, by Joseph A. Weisman and Ronald Sturtz, Newark, N. J., for G. A. C. Commerce and James T. Alcott, Inc.

Theodore L. Cross, New York City, for Sheraton Corporation of America.

Kleinberg, Moroney & Masterson, by Sheldon Schachter, Newark, N. J., for Creditors Committee.

Elmer O. Goodwin, Newark, N. J., for Sun Life Assurance Co. of Canada.

## OPINION

SHAW, District Judge.

On June 3, 1965 petitioners filed a joint petition under Chapter XI of the Bankruptcy Act alleging, among other things, that they "cannot meet their obligations." A receiver was appointed on June 4, 1965. The initial petition was subsequently amended on petition of the debtors and by order of the Referee in Bankruptcy dated July 27, 1965. The substance of the amendment is an allegation that the debtors cannot meet their obligations "as they mature." A consolidated balance sheet as of January 31, 1965 annexed to the petition shows assets of $37,113,269 and total liabilities of $31,065,297. Several plans of arrangement were considered, and finally an amended plan of arrangement was submitted on December 15, 1965.

The Securities and Exchange Commission now moves to intervene in the pending Chapter XI proceedings and to dismiss the Chapter XI petition unless within a period of time fixed by the Court the Chapter XI petition is amended to comply with the requirements of Chapter X or a creditors petition under Chapter X is filed.

Petitioner, Imperial "400" National, Inc. (Imperial), is the parent corporation and the other petitioners are subsidiaries or affiliates. Bristol Financial Corpora-

tion, Imperial "400" Corporation, Imperial "400" Land Corporation, and Motor Hotel Properties, Inc. are wholly owned subsidiaries of Imperial. Trans-National Development Corporation is an affiliate of Imperial by reason of Imperial's ownership of 15,800 shares of convertible preferred stock which, if converted, would amount to ownership of 80% of all of the common stock. Trans-World Motel Supply Corporation and National Motel Construction Corporation are wholly owned subsidiaries of Trans-National Development Corporation. Four Hundred Construction Company is a wholly owned subsidiary of National Motel Construction Corporation. It would serve no useful purpose to comment in detail upon the interlocking association of these corporations and the various functions of each, particularly in view of the necessity for an expeditious decision and the fact that Imperial is the dominant corporation. Moreover, factual detail as to this as well as with respect to the business and financial structure of the debtors is set forth succinctly in the affidavit of Sidney Lapidus annexed to the moving papers of the Commission. The basic facts set forth therein are not disputed. Indeed, the only area in which issue is taken is that of the nature and extent of the financial plight of the debtors and the conclusory

statements to the effect that the proposed plan of arrangement under Chapter XI is the best solution for all parties affected by such financial plight [1]. Hence, the Court does not feel it is necessary to do more in recitation of fact than to touch upon what it conceives to be the most significant factors in resolving the issue of whether the Chapter XI proceeding should be dismissed.

The business in which Imperial is engaged was commenced in January of 1959 by a predecessor corporation, Imperial "400" Motels, Inc. Imperial was incorporated in Delaware on August 16, 1961 and during March of 1963 acquired all of the assets of Imperial "400" Motels, Inc. which had been organized by Bernard Whitney, Robert B. Boyd and Leslie N. Aikman. At the time of the filing of the Chapter XI petition herein Whitney was chairman of the board of directors of Imperial, Aikman was the president and a director and Boyd was executive vice-president and a director. It seems as far as the record discloses, that since its inception business policy was formulated and management controlled by these individuals. The petition initiating the proceeding under Chapter XI of the Bankruptcy Act was signed by Bernard Whitney and Robert B. Boyd and also by the president of Four Hundred Construction Corporation

---

[1]. The following appears at page 37 of the transcript of hearing held on January 7, 1966:

"MR. SCHACHTER: We are prepared to stipulate everything. We feel the issue of insolvency is the only thing we want to argue before this Court.
THE COURT: You stipulate everything in the moving papers of significance except the argument that there should be a Chapter X proceeding?
MR. SCHACHTER: That is correct, except their statement there was a $750,000 equity for stockholders. This we dispute.
THE COURT: Does anyone object to a stipulation by the Securities Exchange Commission as filed?
MR. RAVIN: In my brief I state that we state that the S.E.C. has given the facts accurately except for that one point."
Again at page 61:

"THE COURT: And the stipulation entered upon by the opposing parties.
MR. RAVIN: I beg your pardon?
THE COURT: The Securities and Exchange Commission relies upon the factual record before the Court, which would include the Referee's file as well as the file in these proceedings. The facts contained therein have been stipulated to be true by the opposing parties, is that right?
MR. RAVIN: No, sir.
THE COURT: What is your position?
MR. RAVIN: The question of net worth is not stipulated as being true. We want to put in testimony as to value.
THE COURT: Very well, the stipulation is qualified with the exception as to the net worth figure as shown in the record.
MR. RAVIN: We also wish to put in testimony as to the Sheraton Hotel offer."

and National Motel Construction Company and by the president of TransWorld Motel Supply Corporation. It is also appropriate to note here that there was no formal authorization by the board of directors of any of the debtor corporations to file the petition. From this it may be inferred that the four individuals mentioned who signed the petition assumed or had controlling authority to make major decisions of this nature for the debtors.

In March 1963 Imperial succeeded Imperial "400" Motels in the business of establishing motels throughout the United States. By June 3, 1965, 115 motels were in operation and 14 more were in various stages of construction in approximately 38 states. The sites for motel construction would be obtained by long term leases on undeveloped property. Money for construction of motels would be raised by construction loans. Upon completion of construction in most instances, a 50% interest in the motel would be sold to a third party who became a co-owner with Imperial and who resided at and operated the motel. A few of the motels are wholly owned by Imperial but the majority are operated on a co-partnership basis, the direct management thereof conducted by the resident owner.

There are 1,087,722 shares of common stock, par value $.50, issued and outstanding. As of April 12, 1965 the officers and directors of Imperial owned 696,585 shares of this stock. The remainder was owned by approximately 850 public investors. There are 1,900 shares of 6.6% cumulative preferred stock issued and outstanding, the majority of which is held by public investors. In January 1964 Imperial sold one million 6½% convertible subordinate debentures. It appears that 994,000 of these debentures are ˙outstanding. Since they were issued to "Bearer", the number of debenture holders cannot be determined. They were sold to the public and were issued under an indenture dated January 22, 1964 with The Marine-Midland Trust Company of New York as indenture trustee. It was required in connection with these debentures that Imperial pay interest semi-annually on January 1 and July 1 of each year and that it make substantial payments into a sinking fund. In accordance with the terms of the debenture, Imperial was required to deposit approximately $66,-000 into the sinking fund by June 1, 1965. Interest as of July 1, 1965 amounted to approximately $32,305. Neither the required payment into the sinking fund nor the interest was paid.

Three of the largest creditors are Union Bank of Los Angeles, California (Union), Franklin National Bank of New York City (Franklin), and General Tire Pension Fund, also referred to as General Investment Funds, (General). Pursuant to the proposed plan of arrangement, all of the assets of the debtors are to be conveyed to a corporation to be formed or designated by Union, Franklin and General. This new corporation will pay $300,000 to the receiver to be used by him together with other money on hand or due on accounts receivable as of the date of confirmation of the plan to pay debts incurred by the receiver, administration expenses and allowances and priority claims.

A trustee is to be designated by the official creditors' committee with 50% of the stock of the new corporation to be issued to the trustee. The trustee would also be entitled to money, if any, which the receiver had left after payment of the items above mentioned. Such money paid over to the trustee would be for the benefit of general unsecured creditors. The trustee would hold the stock issued to him by the corporation "in trust for the benefit of all creditors including, without limitation, all general unsecured creditors, all debenture holders, and all claimants under contracts with the debtors who have filed claims * * * as are finally approved and allowed in these proceedings under Chapter XI of the Bankruptcy Act."

The board of directors of the new corporation "shall consist of five persons, of whom two individuals shall

initially be designated by a majority of the Official Creditors' Committee with the concurrence of General Investment Funds and thereafter by the Trustee as provided in the aforementioned Trust Indenture. The remaining three directors shall be designated by the holders of the 50% of the stock retained by the Proposers or their assignee."

Theodore L. Cross, vice-president of legal affairs and treasurer of the Sheraton Hotel chain (Sheraton) testified [Tr. 66] that Sheraton had been approached by the creditors' committee, and had become interested in the proposed plan of arrangement, and was willing to invest $300,000 [2]. According to the proposed plan of arrangement, the total of capital to be paid into the new corporation would be $300,000 represented by 3,000,000 shares of common stock with a par value of $.10 each.

When Mr. Cross was questioned by the Court as to the underlying factors which would account for the financial plight of the debtors, he stated:

"It is attributable to several factors. First of all, a lack of management. The company is being managed as well as it can be under the circumstances, but it has no active hotel direction and management, but it is due in large part to the fact that the individual hotel units were financed with very short maturities. In other words, chattel mortgages would arrange financing for construction that carried very heavy payments of amortization, and in some cases interest up to 10 or 12 per cent, so that even ignoring the parent company debt of upwards to 10 or 12 million dollars, there is a negative cash flow in this picture of upwards to 15 to 30 thousand dollars a month, as I say.

"So that you don't need to be an appraisor in this situation to see that as an economic entity we see no inherent value in this situation, even assuming —I say inherent value. I mean as an organization without support—even assuming its debt were wiped out.

THE COURT: Would I be correct in inferring from what you said that with good management that this chain of motels can be operated at a profit?

THE WITNESS: More important than good management, referral capacity, the referral power of a hotel organization such as ours, but this is the important point, your Honor, at the present time we are willing to put up $300,000 if this thing can be brought out immediately, but a hotel business is not like reorganizing a large metropolitan hotel or an office building. It is a business and it is a business that is deteriorating very fast. We believe if this company goes into Chapter X, and assuming that it can't come out of Chapter X for nine or ten months, the expenses of administration will build up to the point where the company no longer has the attraction that it has at this moment to a hotel organization." [Tr. 67, 68]

It does appear from representations made by counsel at the hearing that differences of opinion arose among the controlling directors as to whether it would be better policy to sell interests in con-

---

2. During the course of argument it was represented by counsel for the debtors that Sheraton would obtain a 50% interest in the new corporation which would be equivalent to practical ownership [Tr. 25]:

"MR. RAVIN: Now in the first place a new corporation is being formed which will be controlled—50 per cent of which goes to the Sheraton Hotel Corporation of America and the other 50 percent is distributed among general creditors. Other stockholders get nothing, so the old stockholders are out.

No. 2—that answers the question as to management. Now the Sheraton Hotel Corporation will be the management. They will own this new company. Fifty per cent is practical ownership."

structed motels rather than to operate them[3].

The accounting method used by Imperial was described by counsel for the receiver as an "ingenious accounting record system." [Tr. 5] Indeed, it becomes apparent from what was stated by counsel at the time of hearing that this ingenious accounting method was used to give an inflated picture of assets in order to enhance borrowing power and that even now the accountant for the receiver is not in a position to state unequivocally whether there is a substantial excess of liabilities over assets. The accounting records of Imperial as of January 31, 1965 showed that there was a stockholder equity of $1,157,977.64. The accountant for the receiver prepared a consolidated financial report as of June 3, 1965 (transmitted September 9, 1965) showing a stockholder equity of $750,000. The tenor of his testimony is that even this was unrealistic and he could not say in terms of market value whether the liabilities were substantially in excess of the assets. His testimony on this is quoted as follows:

"Q. What I'm going to ask you now today, we are in Court January, 1966. Is it your opinion taking into account what the receiver has been faced with, these so-called assets which really are not translatable in cash, is this corporation's fair market value of its assets in excess of its liabilities or is its liabilities in excess of its assets?

\*      \*      \*      \*      \*      \*

A. I don't believe I can give you a true factual answer to that question. I do not know what the current value might be of motel interests, and the net worth of this company fundamentally is predicated upon that net worth.

Q. I'm not asking you that. I am asking—the definition of insolvency under the Bankruptcy Act is the fair market value of the assets after reflecting all the things that you have just discussed that occurred since June 3, and are the fair market value of its assets above or below its liabilities?

A. I would assume, based upon the knowledge I have of the matter, that it is below, that the liabilities are greater than the assets.

Q. Let me ask you another question—

THE COURT: But you don't know.

THE WITNESS: This is a calculated, educated guess.

THE COURT: All right. As a matter of fact, it is a rather close question, isn't it?

THE WITNESS: It is a very difficult question to answer.

THE COURT: I mean as to whether or not there is a substantial difference between the assets and liabilities.

THE WITNESS: Whether there is a substantial difference I would not have any way of answering, but I would say that based upon my reasonable knowledge, based upon my experience in this particular matter, and based upon the fact that these assets should

---

3. Statement of Mr. Silverman [Tr. 12–13]:

"Now what happened in this interim, from January to June, your Honor is that there were management differences in here. The principal of this company in this period was a party by the name of Whitney, and his theory of operations differed from other principals of the company, and there was a stockholder squabble which resulted in the non-Whitney group taking over, and they curtailed the construction work which this company had indulged in under Mr. Whitney's regime.

"Our analysis of these figures shows, your Honor, that from an operating motel viewpoint this company never made money, but it did make money in selling interests in motels to co-owners, so that one faction thought that this ought to be more of an operating company and paid more attention to operations. The Whitney group thought that the best method of procedure was to continue building and selling, so that when the non-selling group took over and curtailed the sales, at what I consider high prices, there were charge-offs on projects which had been in progress and not gone forward with, which reduced the value of the assets because of the abandonment of the projects."

be written off, that is the construction in process, and other items of this nature, that this would produce a negative net worth.

THE COURT: And continuing with your educated guess, would it produce a substantial—

THE WITNESS: I would not go quite that far as to say substantial. I don't know what you mean by substantial. If you are talking about a million dollars as substantial, perhaps not, 500,000 as substantial, perhaps yes." [Tr. 82–83]

None of the officers of the debtor have been examined under oath. It does not appear that any disinterested appraisals of the assets of the debtor have been obtained. Money for administration purposes during the receivership has been obtained in large part from the sale of properties. The co-owners continued to operate the motels and report to the Englewood office of the debtors where there seems that an elaborate system of records is currently maintained with payroll expenses of approximately $26,000 per month. In addition thereto there are expenses for rent, telephone and other items. Current losses being sustained are estimated at from $15,000 to $30,000 per month. The extent to which there is accurate accounting on a monthly basis by the co-owners is not known. It is estimated that for the months of January, February and March 1966 the cash reserve of the receiver will be diminished by at least $50,000.

The receiver presently has $100,000 cash on hand. He had approximately $70,000 when he took over as a receiver. By converting capital to cash he realized approximately $150,000. According to the testimony of the accountant, the net cash deficit for the period from June 1965 to January 1966 was approximately $120,000. The extent to which a further cash reserve can be established by further sale of undesirable motel properties is not known, at least as far as the present record before the Court shows. The accountant stated in connection with further depletion of cash reserves that this was a slack period in the motel business and that losses would decrease beginning "some time at the end of June or the beginning of June." The cash summary of the receiver's account for the period June 4, 1965 to August 31, 1965, marked Exhibit A in the Referee's file, shows total opening cash balance as of June 4, 1965 in the amount of $88,-692.04 and total cash balance as of August 31, 1965 in the amount of $155,-879.81. The extent, if any, to which sales of the debtor's property are represented in these figures is not apparent from examination of the summary report. The introductory statement of this summary report sets forth, among other things:

"This report further, in summary form, sets forth the receipts of the Receiver into his operating account and the receipts of the Receiver into the accounts of the wholly owned and operated motels. On the other hand, this report, in summary form, sets forth the disbursements of the Receiver as to his operating accounts, as to the wholly owned and operated motels and as to transfers from the debtor to the Receiver."

Reference is made to the cash reserve in the hands of the receiver and the anticipated depletion only in connection with the assertion that an attempt to formulate a plan of reorganization under Chapter X would, by reason of continuing expense and delay, plunge the debtors into straight bankruptcy. The Court is not satisfied from what is before it that this would be the case. It is regrettable that more timely action was not taken to bring the matter before the Court. But even in the present posture, the appropriate function of the Court is to determine whether the proceedings herein should have been brought under Chapter X. This same argument with respect to time and expense was asserted in S. E. C. v. American Trailer Rentals Co., 379 U.S. 594, 618, 85 S.Ct. 513, 526, 13 L.Ed.2d 510 (1965). The Court answering that argument stated:

" * * * the requirements of Chapter X are themselves sufficiently flex-

ible so that the District Court can act to keep expenses within proper bounds and insure expedition in the proceedings. We also reject respondent's further argument that the time and expense of a Chapter X proceeding would be so great that the ultimate result might be straight bankruptcy liquidation, which, respondent contends, 'would mean probable total loss for [the] trailer owners.' In addition to the above answers to respondent's general-time-and-expense argument, we feel compelled to point out, without indicating any opinion as to the ultimate outcome of the attempted financial rehabilitation in this case, that it must be recognized that Chapters X and XI were not designed to prolong—without good reason and at the expense of the investing public—the corporate life of every debtor suffering from terminal financial ills. See Fidelity Assurance Assn. v. Sims, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032."

It is argued that under the proposed plan the holders of debentures will occupy a more favorable position than they now have in that they would be on a parity with the general unsecured creditors and further that the representative of the debenture holders favors the plan. First, it cannot be said with any degree of reasonable probability that the unsecured creditors will ultimately fare well under the plan. Second, the debenture holders lose their right to money out of gross income which should have been paid into the sinking fund and for accrued interest. They also lose the future benefits of the sinking fund requirements to be paid out of gross income. Moreover, it is questionable whether P. W. Brooks &

Company is the appropriate representative to give approval to a plan of arrangement on behalf of all of the unknown holders of the bearer debenture bonds[4].

As to the 850 stockholders, it is asserted that they will lose nothing because the condition of the debtors is such that there is no remaining equity nor could there be. By way of corroboration of this it is asserted that the officers and directors of Imperial have consented to the plan of arrangement and thereby lose all hope of realizing anything on their own stock interest. In connection with this it must be noted that it was they who managed and directed the affairs of the debtors including the financing of operations. The extent, if any, to which they are willing to sacrifice their stock interest in order to be relieved of responsibility for previous conduct of the affairs of the debtor is not known. It may well be that they are motivated by nothing but a commendable impersonal interest in affording the best protection possible for the rights of creditors under the proposed plan of arrangement. But whether such be so is not a question that can be answered in the light of information now available. From the record it is apparent that the proposed plan of arrangement was formulated and activated by the major creditors and presumably it is in their best interests that it be approved. The public investors other than the officers and directors, had no voice in the matter.

The situation presented here is not one of a simple composition of debts with minor adjustment of the interests of public investors. What is contemplated is a complete reorganization of the affairs of the debtors formulated by those major

4. Transcript at page 21:

"THE COURT: Statement has been made in briefs that these debenture holders have consented through their representative. What is meant by that statement?

MR. RAVIN: The statement I made was that the bonding house which floated this issue is heartily in favor of this plan.

Now these debenture holders are subordinate to general creditors. The plan recognizes them on a par with them. The bonding house has taken an interest in all these meetings with the creditors' committee and with the creditors, in seeking to avoid bankruptcy, and they were very anxious that the plan be put through so bondholders not be wiped out. Mr. Barringer is here for that reason, because they float other issues and their reputation depends upon keeping the bonds alive and giving the bondholders a reasonable return on their investment."

creditors who it seems, according to the record, have not relied upon the debtors' financial records but who made independent evaluation for the purpose of formulating and activating the plan.

In the case of S. E. C. v. American Trailer Rentals, supra the Court stated:

"The contrast between the provisions of Chapter X, carefully designed to protect the creditor and stockholder interests involved, and the summary provisions of Chapter XI is quite marked. The formulation of the plan of arrangement, and indeed the entire Chapter XI proceedings, for all practical purposes is in the hands of the debtor, subject only to the requisite consent of a majority in number and amount of unsecured creditors, § 362, and the ultimate finding by the court that the plan is, inter alia, 'for the best interests of the creditors,' § 366. 'The process of formulating an arrangement and the solicitation of consent of creditors, sacrifices to speed and economy every safeguard, in the interest of thoroughness and disinterestedness, provided in Chapter X.'" 379 U.S. at 605, 85 S.Ct. at 520.

The complexity of the debtor organization is evidenced by the nature of its capital structure, the varied nature and extent of its indebtedness and the many and varied interlocking interests involved in the ownership, management and operation of the business. The integrity of its records reflecting financial condition is concededly open to question. The limited function of the receiver under the Chapter XI proceeding has made it impossible during the pendency of that proceeding to develop any reasonably accurate analysis of its affairs and particularly of the circumstances which brought it to the point of alleged insolvency. Under a Chapter X proceeding such an analysis leading to a plan of reorganization that would be fair, equitable and feasible would be probable.

The guide lines for determination of whether a proceeding should be under Chapter XI or Chapter X have been laid down in S. E. C. v. American Trailer Rentals Co., supra; General Stores Corp. v. Shlensky, et al., 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956) and S. E. C. v. United States Realty and Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L. Ed. 1293 (1940).

In General Stores Corp. v. Shlensky, et al., it was stated:

"These are typical instances where c. X affords a more adequate remedy than c. XI. The appointment of a disinterested trustee, § 156, his broad powers of investigation, § 167, the role of the trustee in preparing a plan, § 169, the duty of the Securities and Exchange Commission to render an advisory report on the plan, § 172, the requirement that the plan be 'fair and equitable, and feasible', §§ 174, 221, the power to include the subsidiaries, Stineway and Ford Hopkins, in the reorganization of petitioner, § 129—these are controls which c. X *gives to the entire community of interests in the company being reorganized and which are lacking under c. XI.* These controls are essential both where a complicated debt structure must be readjusted and where a sound discretion indicates either that there must be an accounting from the management or that a new management is necessary. Those conditions only illustrate the need for c. X. There may be others equally compelling." (Emphasis supplied) 350 U.S. at 467, 76 S.Ct. at 519.

There is need here for the appointment of a disinterested trustee with broad powers of investigation and need for the assistance of the Securities and Exchange Commission and for the controls which Chapter X affords to assure that a readjustment of the affairs of the debtors will be "fair and equitable and feasible" to "the entire community of interests." Accordingly, the motion of the Securities and Exchange Commission to intervene will be granted and the motion to dismiss this proceeding under Chapter XI will be granted unless within 10 days of the filing of an order herein dismissing the petition, the petition is amended to comply with the requirements of Chapter X

for the filing of a debtor's petition or by the filing of a creditor's petition.

An appropriate order will be submitted promptly. The prospectus of P. W. Brooks & Company dated January 22, 1964 will be marked as a Court exhibit in evidence.