In the Matter of **IMPERIAL "400" NATIONAL, INC., a Delaware corporation, Bristol Financial Corporation, a New Jersey corporation, Imperial "400" Corporation, a Nevada corporation, Imperial "400" Land Corporation, a Delaware corporation, Motor Hotel Properties, Inc., a New Jersey corporation, Transnational Development Corporation, a New Jersey corporation, Four Hundred Construction Corporation, a Delaware corporation, National Motel Construction Company, a California corporation, and Trans-World Motel Supply Corporation, a California corporation, Debtors.**

**No. B 656–65.**

United States District Court,
D. New Jersey.
March 26, 1971.

Joseph M. Nolan, Newark, N. J., for Trustee.

Alan Weiss, Newark, N. J., for General Tire Co.

Sheldon Schachter, Newark, N. J., for Creditors Committee.

Stephen Bosin, New York City, for S. E.C.

## OPINION

SHAW, District Judge.

This matter comes before the Court on application of the Trustee for a fourth *ad interim* allowance. Brief reference to the factual background of this Chapter X proceeding is appropriate. Initially a joint petition under Chapter XI of the Bankruptcy Act was filed by the Debtors on June 3, 1965. A Plan of Arrangement was submitted to the Referee in Bankruptcy on December 15, 1965. Thereupon the Securities and Exchange Commission (hereinafter S.E.C.) moved to intervene and to dismiss the Chapter XI petition. The motion to intervene was granted together with the motion to dismiss unless the Chapter XI petition was amended to comply with the requirements of Chapter X or a creditors' petition under Chapter X was filed. There was compliance with the condition imposed by the Court and thereafter the bankruptcy proceedings were conducted pursuant to the provisions of Chapter X of the Bankruptcy Act.

The complexity and critical condition of the financial affairs of the Debtor Corporations are indicated in the opinion of this Court filed when it ruled upon the motions of the S.E.C. In Matter of Imperial "400" National, Inc., et al., D.C., 274 F.Supp. 342 (1966). The forecast of financial success was dismal. In fact, it was strenuously urged that the Plan of Arrangement submitted to the Referee represented the only possibility of salvage for the creditors because the Debtor Corporations were in a terminal stage of financial illness. The forecast that liquidation was imminent seemed to be prevailing among all interested parties seeking salvage of their losses. It was represented to this Court that the Debtor Corporations could not survive for more than two months. There was approximately $100,000 available for current operating expenses and this fund was being depleted at the rate of $50,000 per month.

Despite the prevailing pessimism among those who wanted quick salvage money pursuant to the proposed Plan of Arrangement, it seemed to the Court as well as to the S.E.C. that the possibility of reorganization under Chapter X should be explored. The Court was well aware at that time of the complexity of the affairs of the Debtor Corporations and the formidable task that would be imposed upon any Trustee in an attempt to bring some measure of order into the chaotic affairs of the Debtor Corporations and to accumulate funds to keep the business in operation.

In the matter of selecting a Trustee it was the opinion of the Court that the exceptionally difficult problem of managing the Debtor Corporations in such manner that some degree of financial success be achieved demanded talent both in the field of law and the field of sound practical business management. One hundred fourteen motels constituting a chain and operated principally by co-owners were located in thirty-eight states across the country. Each motel was a single separate óperating unit. The interlocking relationship of the Debtor Corporations, the fantastic capital structure, and the varied interlocking relationships of management with co-owners, coupled with the complex mort-

gage financing of real and personal property subject to the laws of each of the thirty-eight states presented a morass of legal and economic problems from which it seemed that the Debtor Corporations could never be successfully extricated.

A competent Trustee assisted by competent counsel offered the only hope. In the matter of these appointments the qualifications had to go beyond a capacity to write a good law review article or a learned treatise on economics. It was necessary to find competent, reputable lawyers who, in addition to legal ability, possessed the kind of sound practical business judgment essential to management of a business. The public relations aspect also had to be considered in connection with morale of employees and each of the co-owners operating the individual motels. Another consideration in the selection of a Trustee who would accept appointment was the inducement to a prominent attorney with a lucrative practice to devote the better part of his working time over a period of years to rehabilitation of the business of the Debtors with dim prospect at the outset that there would be sufficient funds for adequate compensation.

After discussion of the magnitude of the task of reorganization and what the Court expected in the way of daily attention to the affairs of the Debtors, Thomas J. O'Neill, Esq., agreed to accept appointment as Trustee if he were given the assistance of competent counsel who would share the legal, administrative and investigative work. It was apparent at the outset that extensive investigation of factual background beyond that disclosed by corporate records was necessary to unearth the causes of financial disaster and to retrieve and protect assets. Mr. O'Neill was then and still is associated with Andrew B. Crummy, Esq., as a partner in the practice of law and the Court was assured that Mr. O'Neill would have the benefit of Mr. Crummy's extensive experience and expertise in the field of bankruptcy. The assistance afforded to the Trustee by his senior partner, Mr. Crummy, in solving difficult business and legal problems has been invaluable to the estate.

The Trustee was appointed by order of this Court on February 24, 1966, and immediately thereafter the Court appointed Joseph M. Nolan, Esq., as counsel. In addition to Mr. Nolan's capacity to function effectively as well-qualified counsel, he also had extensive experience in directing investigation, analysis of corporate records, and in the field of tax law gained through prior experience with the Internal Revenue Service.

Looking back over appointments in bankruptcy where there is an estate of this magnitude, it is not considered unusual for the court to appoint Co-Trustees and Co-Counsel. In this instance both Mr. O'Neill and Mr. Nolan had well-qualified partners and associates in the practice of law upon whom they could rely for assistance and the Court did not feel that it would be necessary to burden the estate with the extra expense of additional appointments.

Events since the appointments have assured the Court that its confidence was not misplaced. Diligence and loyalty to the assigned task of rehabilitation of the Debtors has been amply demonstrated, and it is the opinion of the Court that criticism of either the Trustee or Counsel for the Trustee is entirely unjustified and finds no support in the record. In fact it was noted and reiterated by the United States Court of Appeals for the Third Circuit "that we are impressed with the apparent success of the reorganization to date."

It has not been urged that the present *ad interim* allowance sought by the Trustee, considered together with previous allowances, is unreasonable when considered in the light of the extent and value of services performed since February, 1966. Much has been said about the incentive created to close an estate expeditiously if allowances are withheld until the estate is closed. There is no doubt that expeditious closing of the estate, consistently with rehabilitation

which will produce the best Plan of Reorganization that is fair, equitable and feasible, is desirable, but neglect of the rehabilitation factor which hastens the day for an allowance should not be encouraged. The theory that the more quickly you close an estate the more you save is false. A comparison of the Chapter XI proceedings which produced the proposed Plan of Arrangement with the present proposed Plans of Reorganization demonstrates this. Haste to dispose of problems without serious consideration of the merits may account for the loss of the Little Rock, Arkansas, motel and other capital assets. Expeditious closing regardless of what happens to the assets is no service to the creditors or the public investors.

In this instance the Court wanted competent administration which would accomplish the kind of rehabilitation that would produce good proposed Plans of Reorganization. Much of that objective has been accomplished but it has taken time due to the complexity of the affairs of the Debtors. In connection with the *ad interim* allowances, it is the opinion of this Court that it would be grossly unjust to ask that a Trustee such as Mr. O'Neill maintain an office at present day overhead, devote the better part of his time over a period of nearly five years and wait for reasonable compensation until the estate is closed. If this became the prevailing practice, the better talent would not be available for Chapter X proceedings. As a matter of fact there would be no incentive to seek this kind of work. There is no sound reason in my opinion why a lawyer should have to pay rent, pay his employees and associates and wait for years to get some money for himself.

It was suggested that $20.00 per hour would be reasonable compensation for the kind of professional skill that was required in this case. Even assuming the suggested overhead of 45%, the net return would only be a little better than a laborer's wage. Looking back to my own experience in the practice of law and from what I have heard of the rising costs of overhead, I have doubt whether overhead of most of the prominent firms in this metropolitan area is less than 60% of gross, considering the salaries that must be paid to secretaries and the salaries that must be paid to competent associates. This Court has exercised close supervision over the administration of this estate and has personal knowledge of the time spent by the Trustee, the skill exercised and the value of the services to the estate. Funds are available to pay the requested allowance and there is no sound reason why approval of it should be deferred until a Plan of Reorganization is adopted.

The Court was remiss in failing on approval of previous *ad interim* allowances to set forth in detail the underlying reasons and it was with this in mind that the Court felt that a better edited opinion than that dictated extemporaneously at the close of the hearing should be filed.

The requested allowance of $30,000, plus disbursements in the amount of $722.83 is approved as set forth in the order entered pursuant to the oral opinion of the Court dictated upon the record at the close of the hearing.