In the Matter of **SOUTHERN LAND TITLE CORPORATION**, Debtor, in Proceedings for the Reorganization of a Corporation.

In re **BOURBON KINGS HOTEL CORPORATION**, the Five Flags Building, Inc., Sotan, Inc., and Puritan Oil & Gas of New England, Inc.

No. 67–135.

United States District Court
E. D. Louisiana,
New Orleans Division.
Nov. 27, 1968.

See also D.C. 301 F.Supp. 368, 379.

James J. Morrison, New Orleans, La., for debtor corporations.

Cicero C. Sessions, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, La., for Leonard R. Spangenberg, Jr.

D. D. Howard, Monroe & Lemann, New Orleans, La., for National Bank of North America.

Peter J. Butler, Sehrt, Boyle & Wheeler, New Orleans, La., for National Amercan Bank of New Orleans.

Moise S. Steeg, Jr., Steeg & Shushan, New Orleans, La., for Mercantile National Bank of Dallas and Lomas & Nettleton Financial Corp.

Donald Zuber, Seale, Smith, Baine & Phelps, Baton Rouge, La., for National American Life Ins. Co.

HEEBE, District Judge:

The § 144, 11 U.S.C. § 544, hearing with respect to the above corporations, all wholly-owned subsidiaries of Southern Land Title Corporation, was held on September 20, 1967. On October 16, 1967, we entered an order sustaining the voluntary petition of each of the subsidiaries as well as the involuntary petition for the reorganization of Southern Land. We indicated that we would assign written reasons at a later date. Inasmuch as the matter is now on appeal, we issue this opinion to serve as our findings of fact and conclusions of law which contain our reasons for our rulings as to the subsidiaries as we have already issued our opinion as to Southern Land on November 25, 1968. On October 11, 1968, we issued orders adjudging Place Vendome, Inc. and Lakeview Properties, Inc. bankrupt and directed that ordinary bankruptcy proceedings be proceeded with for those corporations. Consequently, no need exists at this time to explain our rulings initially sustaining the petitions for those corporations, and in the interest of economy we will not consider those corporations.

As noted in the *Southern Land* opinion, In re Southern Land Title Corporation, D.C., 301 F.Supp. 379, each of the six subsidiaries of Southern Land filed its own voluntary petition for reorganization on June 19, 1967, after we dismissed the involuntary petition for the reorganization of Southern Land and its six subsidiaries insofar as it pertained to the six subsidiaries. We now turn to an individual consideration of the subsidiaries.

▇▇ (1) *Bourbon Kings Hotel Corporation.* The National Bank of North America, a creditor, was the only party objecting to the voluntary petition of the Bourbon Kings Hotel Corporation (Bourbon Kings). The issues raised by the Bank's answer were similar to the issues presented at the good faith hearing of Southern Land. However, since the prior *voluntary* petition of Southern Land, which was heard by Judge Mitchell, did not relate to any of its subsidi-

aries, there was no issue presented in our case with respect to any of the subsidiaries regarding the "pending petition" and res judicata and estoppel arguments which were presented with regard to the *involuntary* petition against Southern Land and which we fully discussed in the *Southern Land* opinion. Nor was there any issue presented with respect to interposition by Southern Land of the petitioning creditors inasmuch as this was a voluntary petition. The Bank, however, did mention in its answer that the petition of Bourbon Kings was filed for purposes of delay. The Bank, however, did not offer anything to support that statement. We assume that the Bank more or less relied on Judge Mitchell's finding, discussed in our *Southern Land* opinion, with respect to the voluntary petition filed by Southern Land. However, with the exception of the fact that this was also a voluntary petition, the differences which we pointed out in the *Southern Land* opinion between Judge Mitchell's case and our case also exist with respect to Bourbon Kings. On page 394 of the *Southern Land* opinion we pointed out the eight main factors which Judge Mitchell's findings of fact and conclusions of law indicated he relied upon. The last four factors did not exist in our *Southern Land* case and do not exist with respect to Bourbon Kings. Further, the first factor does not exist with respect to Bourbon Kings inasmuch as the debtor corporation included its balance sheet with its verified petition. Nor do the third and fourth factors exist with respect to Bourbon Kings. In the absence of these factors, as well as the absence of any other factors which would lead us to believe that the Bourbon Kings was merely seeking delay, we are unable to conclude that delay was the purpose of the petition. It is true that the petitioner has the burden of proving the statutory elements of good faith when those allegations of the petition are controverted. However, when the petitioner meets that burden, as Bourbon Kings has, and there are no facts ap-

parent to the Court upon which it feels justified to conclude that the petition was filed for purposes of delay or is for some other reason not within the general undefined meaning of good faith, we believe it is incumbent upon the parties opposing reorganization to come forward with some evidence of their position. For once the petitioner has satisfied the Court that the four statutory elements of good faith exist, the only logical inference this Court can draw is that the petition was not filed for purposes of delay.

The crucial issue with respect to Bourbon Kings is, as it was with respect to Southern Land, whether it is unreasonable to expect that a plan of reorganization can be effected. We do not feel it is necessary to discuss the Bank's averments that no equity exists in the debtor's property for the unsecured creditors or for the stockholders and that the debtor's earning power is insufficient to meet its obligations as they mature and that therefore it is unreasonable to expect that a plan of reorganization can be effected because we thoroughly discussed the same contentions in *Southern Land*. We note that the Bank does not aver that the assets of Bourbon Kings are deteriorating and declining in value, as it claimed with respect to its property in Southern Land, and we need not discuss that. In fact, the only asset of Bourbon Kings at the time the petition was filed was the Bourbon Orleans Hotel and its furniture and fixtures, and it is clear that the Hotel is not declining in value and thus the Bank's security is not being impaired.

 The pro forma balance sheet of Bourbon Kings of December 15, 1966, which was attached to its petition, indicates that the Bourbon Orleans Hotel is carried on the books at a value of $12,500,000. Its liabilities include a first mortgage held by the National Bank of North America (formerly Meadow Brook National Bank) for $4,156,354.21, junior mortgages held by the Exchange National Bank of Chicago for $564,450.00 and by Dan M. White, Agent, for $540,-

000.00, accounts payable of $370,656.24, notes payable of $55,220.15, and taxes of $8,250.00, for total liabilities of $5,694,900.60. This leaves an ostensible net equity of Bourbon Kings of $6,805,099.40. It is clear, however, that the Bourbon Orleans Hotel is not worth $12,500,000.00. At the good faith hearing of Southern Land, Mr. Henican, who was president of Southern Land until the time it filed its own voluntary petition for reorganization, was called by counsel for the National Bank of North America for cross-examination under F.R. Civ.P. 43(b) as to the value of the Bourbon Orleans Hotel as well as for other purposes. As we indicated at the hearing, we felt that it was quite proper for the Bank to call Mr. Henican for cross-examination under Rule 43(b) even though at that time he was no longer an officer of Southern Land. Even if this was not proper under Rule 43(b), it would be quite proper under § 21(j) of the Bankruptcy Act, 11 U.S.C. § 44(j), which is applicable to reorganization proceedings by virtue of § 102 of the Bankruptcy Act, 11 U.S.C. § 502, even though counsel for the Bank did not refer us to § 21(j). Henican testified that he thought the Hotel was worth between six and one-half to seven and one-half million dollars, and that, in any event, it was worth more than the liabilities reflected on the balance sheet of Bourbon Kings. He also testified that an option agreement had been entered for the proposed sale of the Hotel for seven and one-half million dollars but the sale was never consummated because a first mortgage accommodation could not be made. This testimony was placed into evidence at the good faith hearing on Bourbon Kings through the introduction of all of the evidence of the good faith hearing of Southern Land. Counsel for the Bank joined in the objections made by some of the other parties at the good faith hearing to the introduction of this evidence on the ground that not all of the parties interested in the subsidiaries were interested in or present at the Southern Land hearing. Even if the Court could ignore such evidence, the objection certainly has no merit as far as the National Bank of North America is concerned inasmuch as the Bank was the party which placed Henican on the stand for the purpose of eliciting such testimony. Actually, it may only be a case of Peter not knowing what Paul was doing because Mr. Jerry Brown represented the Bank at the good faith hearing of Southern Land whereas Mr. D. D. Howard of the same firm was representing the Bank at the hearing on the subsidiaries. Mr. Howard also objected on the basis of the "clutter rule," as he put it, and, truthfully, we are inclined to agree with him that this is probably "the most cluttered up record in the world." We are certainly not enthused with the complexity of all of these interrelated proceedings nor the eleven gargantuan volumes which constitute the record in this proceeding. However, be that as it may, it is clear that the testimony of Henican is admissible as far as the good faith hearing on Bourbon Kings is concerned, and we now overrule the objections to that extent.

█ From this evidence, which was uncontradicted, we are able to conclude that equity probably does exist in the Bourbon Kings for its unsecured creditors and stockholders' which would most likely be lost if the secured creditors were permitted to foreclose on the Hotel. This is certainly *not* the case of In Re Rice-Varick Hotel Co., 184 F.Supp. 864 (D.N.H.1959), aff'd sub nom., Goodman v. Michael, 280 F.2d 106 (1st Cir. 1960), or In Re St. Charles Hotel Co., 60 F. Supp. 322, aff'd 149 F.2d 645 (3rd Cir. 1945), cert. den. 326 U.S. 738, 66 S.Ct. 48, 90 L.Ed. 440 (1945), nor is the Bourbon Orleans as poorly situated as the hotel in In Re Diversey Hotel Corp., 165 F.2d 655 (7th Cir. 1948), cert. den. 333 U.S. 861, 68 S.Ct. 739, 92 L.Ed. 1140 (1948), in which the Court upheld the petition for reorganization where the liabilities of the hotel exceeded by one-

sixth the best valuation of the hotel, or In Re A. C. Hotel Co., 93 F.2d 841 (7th Cir. 1937), where a plan of reorganization was effected even though the liabilities of the hotel exceeded its assets by more than one-fifth. Moreover, we think it obvious that under proper management the Hotel can be operated quite profitably as evidenced by the fact that it produced sufficient income to cover operating expenses, apart from mortgage principal and interest payments, prior to the trustee's operation of the Hotel and that it has produced even greater income under the trustee's management, without any capital improvements. The trustee has been able to generate more income by merely replacing former management and effecting a few minor adjustments in the hotel's operation. In fact, he has accumulated approximately $300,000 in cash or collectible accounts receivable during the period he has operated the hotel without paying anything on mortgage principal or interest. His operation of the Hotel has been on a temporary basis with only a temporary staff and without the advantages of advertising or referrals which accrue to a permanent operation. With capital improvements estimated early in this proceeding of about $300,000, the Hotel, which is by no means in a state of general disrepair at present, would be able to maximize its profits and earn considerably more income than at present. It was also apparent early in the proceeding that whoever invested in the Hotel would most certainly undertake to make the necessary improvements since the increased revenue would make it well worthwhile. In this respect Bourbon Kings is somewhat similar to In the Matter of Plaza Towers, Inc., 294 F. Supp. 714 (E.D.La.1967), wherein we upheld the petition for reorganization even though the building was not yet completed. Yet the Bourbon Orleans Hotel is already producing a considerable operating income.

From the foregoing, we easily conclude that it is not unreasonable to expect that a plan of reorganization for Bourbon Kings may be effected. We might also note that our decision which is based on the financial posture of that corporation is also substantiated by the additional factors which we relied upon in *Southern Land*, such as, for example, the fact that only one creditor, the National Bank of North America, albeit the owner of the first mortgage on the Bourbon Orleans, opposed the petition for reorganization, and the fact that the trustee was most impressed and optimistic at the time of the good faith hearing with the chances for successfully reorganizing Bourbon Kings. Further, at the time of the good faith hearing on September 20, 1967, an "englobo" plan of reorganization, encompassing these subsidiaries and all of Recile's enterprises, based on the $25,000,000 Hughes Aircraft commitment, had been filed with the Court by the Hanover Corporation, and at the time we approved the voluntary petitions of the subsidiaries, as well as the involuntary petition for Southern Land, Hanover had already amended the plan in an attempt to make it more acceptable. Thus, we could not say that it would be unreasonable to expect that a plan of reorganization could be effected, even though the Hanover Plan subsequently fizzled which fact, as indicated in *Southern Land*, is irrelevant to the prior good faith determination. At this point we might note, parenthetically and even though it could not possibly have had any bearing on our decision on the good faith hearing, that the trustee presently has under consideration two different proposals for the reorganization of Bourbon Kings, neither of which is linked to any "englobo" concept which has been totally and completely abandoned by the trustee and the Court as evidenced by the many disclaimers and sales which have occurred herein,[1] and both of which would satisfy

---

1. This does not imply, however, that the trustee and the Court will not entertain a modified and realistic "englobo" plan.

Several parties are presently interested in putting together a plan encompassing the attractive property in this and re-

the first mortgage holder, the National Bank of North America, in full and would provide immediate sums to the junior interests in that corporation. The trustee is still negotiating with the proponents for the benefit of the junior interests since he is not yet satisfied that the proposals effect the maximum which can be obtained with the Bourbon Kings and therefore he has not recommended either proposal to the Court.

■ Having resolved the only serious issue with respect to Bourbon Kings that it is not unreasonable to expect that a plan of reorganization can be effected, we turn to the issues presented under § 146(2) and § 146(4) of the Bankruptcy Act, 11 U.S.C. § 546(2), (4). We considered both of these issues at some length in *Southern Land*, and no need exists to reiterate our statements in that opinion inasmuch as the situation is practically the same with respect to Bourbon Kings. Based on our decision in *Southern Land*, it is clear that § 146 (2) and (4) offer no impediment to the voluntary petition of Bourbon Kings for reorganization.

For all of the foregoing reasons we sustained the petition of Bourbon Kings.

■ (2) *Five Flags Building, Inc.* No answer has been filed controverting the allegations of the petition of Five Flags Building, Inc. Consequently, no hearing under § 144 of the Bankruptcy Act, 11 U.S.C. § 544, was necessary with respect to that petition, and we need only briefly set forth our reasons for sustaining the petition of Five Flags.

The petition reflects that at the time it was filed, the debtor corporation did not own any assets whatsoever. It possessed liabilities of $135,691.46 according to its pro forma balance sheet. Five Flags did claim, however, the right to reclaim the building at 225 Baronne Street. The petition attributed a value of $17,-

500,000 to that building, which is a modern, high-rise, office building in the center of the business district of New Orleans, plus a value of $2,611,931.94 in accounts receivable which, apparently, were also transferred with the building on September 21, 1966, and which would give Five Flags a total of $20,111,931.94 in assets. If the building were reclaimed, Five Flags would also reacquire three mortgages totaling $16,321,764.74 which, according to its balance sheet, would leave a net equity in Five Flags of $3,654,475.73.

■ Based on these uncontroverted allegations of the petition which were verified, we could see no barrier to approving the petition. It is true that the debtor could have filed for bankruptcy and therein sought to reclaim 225 Baronne Street. However, had it been successful, the bankruptcy court would be in no position to adjust the secured indebtedness and effect the rehabilitation of the debtor corporation. Corporate reorganization is the only means available to accomplish this.

Moreover, the fact that the debtor did not own any assets at the time the petition was filed does not alter our conclusion. The possibility of reclaiming the building could not be any more speculative than the possibility of discovering ore in White v. Penelas Mining Co., 105 F.2d 726 (9th Cir. 1939). More in point is the decision of our predecessor-once-removed, the Honorable J. Skelly Wright, now Judge of the United States Court of Appeals for the District of Columbia Circuit, in In the Matter of Magnolia Park, Inc., Bankruptcy Docket No. 9010, E.D.La., who, as we stated in *Plaza Towers, supra*:

" * * * was faced with the following situation: the petitioning debtor, which was engaged in the conduct and presentation of thoroughbred horse

---

lated proceedings such as the Plaza Towers, the 225 Baronne Street Building, The Bourbon Orleans, and the Sotan Properties as well as other property of the debtor corporations which is able to "pay its way." We would be amenable

to such a plan provided, of course, the absolute priority rule is strictly observed. The pure "englobo" theory, however, encompassing all of the debtors' property has been irrevocably discarded.

racing, had sold its racetrack, with a lease-back provision; prior to the reorganization proceeding, judgment had been entered against it cancelling its only substantial asset, the leasehold interest in the racing facilities. The referee in bankruptcy, sitting as special master to hear and report to the judge, determined that the petition was not filed in good faith because there was no possibility of reorganizing the corporation in the absence of the leasehold interest. Judge Wright determined that since the trustee might have a valid action, under Article 2589 of the Louisiana Civil Code, for rescission of the original sale of the racetrack, the possibility of success in that action was sufficient to support a finding that the petition was filed in good faith. * * * Notice of appeal of Judge Wright's decision was filed. However, prior to argument on appeal, the complex dispute between the landlord and tenant-debtor-corporation was settled, a new lease was prepared and a reorganization plan was indeed adopted." At 727.

The decision in Oglesby & Simpson Supply Co. v. Duggan, 174 F.2d 904 (8th Cir. 1949), makes our case even stronger than the *Magnolia Park* decision—and *Magnolia Park* is precedent as clear and as direct as we could ever expect to find —because *Duggan* brings in the parent-subsidiary relationship which was not even present in *Magnolia Park*. In *Duggan* a subsidiary filed a petition for reorganization in the then pending reorganization proceeding of its parent as was done here. The subsidiary had debts exceeding two million dollars and all its assets had been sold for fifty-five thousand dollars. In spite of the fact that the subsidiary was hopelessly insolvent with no right of reclamation, the court sustained its petition on the theory that its estate should be administered with that of its parent. The double-barrel effect of the *Magnolia Park-Duggan* combination undeniably warrants the decision we reach. Finally, we note that inasmuch as Five Flags owned no assets at all at the time its petition was filed, the creditors holding the $135,691.46 indebtedness of Five Flags, which was the total of its indebtedness at the time the petition was filed, are in no way injured by our decision inasmuch as they are not forestalled from foreclosing or otherwise collecting their claims. They can only be aided by our decision.

Moreover, we pause to note that Five Flags appears well on its way to the same result as *Magnolia Park*, although this, of course, had no bearing on our original decision sustaining the petition. A reclamation suit was initiated in May of 1968, although on a different basis than that originally claimed to exist by the debtor corporation, and the trustee has already produced considerable favorable evidence in that suit which is being tried before us. We do not deem it proper to comment on the merits of that suit in greater detail inasmuch as it is still pending as an open suit. The parties have temporarily suspended the trial of that lawsuit in an attempt to negotiate a compromise settlement. As we have pointed out elsewhere, the trial of that suit could not possibly proceed without seriously damaging the excellent chances which do exist for a compromise, the reason being that the reclamation of 225 Baronne Street is an emotionally laden issue between the principals involved, other than the trustee and his attorney, and the attorney for the trustee would necessarily arouse much antagonism in cross-examination of the very same persons with whom he and the trustee would be attempting to work out an amicable settlement. It would be most insensible to place the attorney for the trustee and the trustee in such an awkward situation which could endanger the success of either the compromise or the lawsuit. We have constantly been kept apprised of the developments in the negotiations and have no intention of permitting them to drag on without substantial basis. The resumption of the trial is presently set for December 3 and 4, 1968, and unless we are convinced that substantial progress has been made

in the negotiations, we will have no alternative but to forsake the attempted compromise and resume the lawsuit. Our anxiety in this matter is not caused by the situation with regard to Five Flags, for if that were all that we were concerned with we would have no hesitancy in permitting the negotiations to continue for as long as the parties wished to negotiate. Rather, our anxiety is caused by the situation as it exists at present with respect to Southern Land inasmuch as its fate, in substantial part, hinges upon the success of reclaiming 225 Baronne Street, and we are not inclined to hold Southern Land in limbo any longer than necessary in view of the considerable length of time which that proceeding has already been pending.

(3) *Sotan, Inc.* The petition of Sotan for reorganization was controverted by two of its creditors, Mercantile National Bank at Dallas, holder of a first mortgage, and Lomas & Nettleton Financial Corporation, holder of a second mortgage. Mr. Moise Steeg represents both of these creditors and when the matter came on for hearing pursuant to § 144 of the Bankruptcy Act, 11 U.S.C. § 544, the Court agreed with Mr. Steeg and counsel for the debtor corporation to continue the matter without date with the understanding that either party could request the Court to place it back on the docket for hearing at any subsequent time. Neither party has made such a request to date, and the § 144 hearing with respect to Sotan has never been held. In view of the mandatory language of § 144 which states that the judge "shall" determine the issues presented by the pleadings when a creditor files an answer controverting any of the material allegations of the petition, we do not here mean to shift the burden of setting up the good faith hearing to the parties. Quite frankly, however, we have been under the general impression throughout that the creditors who filed answers to Sotan's petition were not opposed to reorganization if it can be effected. Mr. Moise Steeg has been most cooperative in the attempts which have

thus far been made to reach a proposed plan. In fact, Lomas & Nettleton, which apparently has a substantial interest in Hep, Inc., which presently owns approximately 13,000 acres of the "Sotan Properties," agreed from the outset to reconvey the Sotan Properties to the debtor, and the trustee has been negotiating throughout these proceedings for the terms and conditions of the settlement with Hep, Inc. Parenthetically, we might note that at present Hep, Inc. has agreed to reconvey the Sotan Properties to the debtor estate for less than what it has invested in the property. A joint petition by the trustee and Hep, Inc. was filed herein on November 26, 1968, in which the petitioners agreed to compromise the reclamation suit which was filed by the trustee against Hep, Inc. The compromise, which is subject to Court approval under § 27 of the Bankruptcy Act, 11 U.S.C. § 50, proposes the payment by the trustee of $7,600,000 to Hep, Inc. for the 13,000 acres of the Sotan Properties which it owns and which is less than the $8,000,000-plus Hep, Inc. has invested in the property. In view of the relations between the opposing creditors and the debtor which have always appeared rather amicable to us and in view of their continuing negotiations and in view of the agreement at the originally scheduled good faith hearing on Sotan, we have simply never deemed it necessary to hold such a hearing.

We sustained the petition of Sotan for much the same reason as we sustained the petition of Five Flags. At the time the petition was filed, Sotan owned no assets whatsoever other than the alleged right to reclaim the Sotan Properties which properties consist of approximately 13,500 acres of undeveloped land across the Mississippi River from Baton Rouge, Louisiana. The pro forma balance sheet of Sotan reflected total mortgage indebtedness of $6,780,000 plus accounts payable, notes payable, and taxes totaling $559,492.88 for total liabilities of $7,339,492.88. The balance sheet claimed a value for the Sotan Properties

of $32,000,000. At the good faith hearing of Southern Land, testimony was adduced which shows that the Sotan Properties do have a great present value merely because of its location. This evidence, which was discussed more thoroughly in the *Southern Land* opinion, is not binding upon the creditors of Sotan pursuant to the understanding which existed when it was adduced. However, we are unable to ignore the basic fact that the very location of the property does give it substantial present value even though we are unable to fix its valuation with any great certainty. In any event, inasmuch as the debtor claimed a right to reclaim this property and did not own any other assets, its situation was the same as the situation of Five Flags, and the discussion regarding Five Flags, *supra*, thoroughly reveals our views in this connection, and no need exists for further reiteration at this point.

Again, subsequent to the good faith hearing the trustee filed suits seeking to reclaim the property. Two suits were filed to reclaim the Sotan Properties. One was filed to reclaim 500 acres conveyed to Louis Roussel and another suit was filed to reclaim approximately 13,000 acres conveyed to Hep, Inc. As noted above, the parties have reached a compromise agreement on the reclamation suit against Hep, Inc., although the Court has not yet approved the compromise, and the suit against Louis Roussel for the other 500 acres is still pending.

(4) *Puritan Oil & Gas of New England, Inc.* Two creditors of Puritan Oil & Gas of New England, Inc. (Puritan), the National American Bank of New Orleans and the National American Life Insurance Company, both holders of first mortgages, filed answers controverting the debtor's petition. In general, they raised the same basic issues which we have disposed of in the *Southern Land* opinion and in the foregoing opinion relating to the other subsidiaries. The most crucial issue, again, is whether it is unreasonable to expect that a plan of reorganization can be effected.

The petition reflects that Puritan is the owner of two portions of realty in New Orleans, the Stevens Apartments and the New Orleans Federal Savings & Loan Building, an office building which is located on the fringe of the city. The petition attributes a total value of $2,284,839.00 to these real properties plus a value of $720,273.47 for receivables and $16,326.00 for furniture and fixtures for total assets of $3,021,438.47. Of the total alleged liabilities of $2,309,861.64, mortgages constitute $2,170,219.24 and notes payable, accounts payable and taxes aggregate the remaining $139,642.40. This ostensibly leaves a net equity of $711,576.83 in the debtor corporation. At the good faith hearing the debtor relied on the allegations of the petition, which was verified, and the proposed plan of reorganization by the Hanover Corporation. The opposing creditors did not offer any evidence in contradiction of the petition.

■ We sustained the petition because we did not think it was unreasonable to expect that a plan of reorganization can be effected. Were this petition the only experience we encountered with the debtor we probably would not be willing to draw any inferences from its petition. However, as noted in the *Southern Land* opinion, the values attributed by the various debtor corporations in all of these related proceedings to its assets have not been grossly exaggerated with the exception of the Bourbon Orleans Hotel. We do, of course, suspect some inflation in the stated value of the assets. However, our prior experience has shown that the properties have not been grossly exaggerated. Inasmuch as we can draw reasonable inferences from the petition, In Re Bush Terminal Co., 10 F.Supp. 315 (E.D.N.Y.1935), and inasmuch as "the court may be satisfied that the petition is filed in good faith in the absence of offer of proof to the contrary," Manati Sugar Co. v. Mock, 75 F.2d 284, 285 (2d Cir. 1935), we cannot say that the debtor does not have any chance for successful reorganization "until the credi-

tors, stockholders and the public have had an opportunity of knowing with certainty the financial status of the debtor," In Re Doyle Mfg. Corp., 77 F. Supp. 116 (N.D.N.Y.1948), for we believe that equity may well exist for the junior interests in Puritan. Our conclusion that it is not unreasonable to expect that a plan of reorganization can be effected is substantiated by the fact that at the time of the good faith hearing, a plan of reorganization had already been filed and at the time we sustained the petition it had already been amended in order to make it more acceptable, all of which was discussed in some detail in connection with the discussion on the petition of Bourbon Kings. Moreover, even if the debtor had been hopelessly insolvent, and we do not so find, the *Duggan* case, *supra*, would seem to authorize the filing of the petition for reorganization by Puritan in the reorganization proceeding of its parent, Southern Land. For these reasons, we sustained the petition of Puritan.