In the Matter of BUSINESS FINANCE CORPORATION.

Appeal of The PHILADELPHIA NATIONAL BANK, in No. 19,192.

Appeal of The FIDELITY BANK, in No. 19,193.

Appeal of GIRARD TRUST BANK, in No. 19,194.

Appeal of CONTINENTAL BANK & TRUST CO., in No. 19,195.

Appeal of The CITIZENS BANK, in No. 19,196.

Nos. 19192–19196.

United States Court of Appeals, Third Circuit.

Argued March 2, 1971.

Decided Sept. 13, 1971.

As Amended Nov. 1, 1971.

on the brief), for appellee, Business Finance Corp.

Nathan Miller, Miller, Pincus, Greenberg & Golden, Philadelphia, Pa., argued for appellee, debenture holders committee.

Before HASTIE, Chief Judge, and KALODNER and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

These appeals present the narrow issue whether the District Court was "clearly erroneous" in its fact-finding that the petition for reorganization of the debtor, Business Finance Corporation, under Chapter X of the Bankruptcy Act [1] was filed in "good faith" within the meaning of § 146(3) of the Act.[2]

The District Court made the "good faith" finding in its Order of July 6, 1970, which granted the Chapter X reorganization petition filed by the debtor, its Receiver in then pending proceedings under Chapter XI of the Bankruptcy Act, and a Committee representing 350 holders of $2,800,000 of its long term debentures. The latter are subordinated to loans of $2,007,000 owed by the debtor to the five appellant banks. Four of the banks are secured creditors;[3] the fifth is unsecured.[4]

The debtor is a publicly-owned corporation, with some 200 shareholders. It is engaged in the commercial finance business, viz., commercial loans which are collaterally secured, and, in the venture capital field, viz., equity investments in various other corporations. The debtor, and a wholly-owned subsidiary, Pennsylvania Capital Growth Corporation ("PC

Leon S. Forman, Wexler, Weisman, Maurer & Forman, Philadelphia, Pa., for appellant.

Nathan L. Posner, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., argued (Victor Wright, and Mesirov, Gelman, Jaffe & Levin, Philadelphia, Pa.,

1. 11 U.S.C.A. § 501 et seq.

2. Section 146(3), 11 U.S.C.A. § 546, provides in relevant part:
   "Without limiting the generality of the meaning of the term 'good faith', a petition shall be deemed not to be filed in good faith, if—
   "(3) it is unreasonable to expect that a plan of reorganization can be affected;
   * * * *".

3. The four secured banks are Philadelphia National Bank, claim $467,598.61; The Fidelity Bank, claim $467,488.62; Girard Trust Bank, claim $233,799.31; Continental Bank and Trust Co., claim $716,229.98.

4. The Citizens Bank has an unsecured claim of $122,130.

GC"), licensed as a Small Business Investment Company, under the Small Business Investment Act of 1958, have numerous investment and equity interest in various businesses. All of the capital stock of PCGC is pledged to the four appellant banks specified in footnote 3.

The distilled essence of the appellants' contention is that the evidence failed to· establish a reasonable expectation that the debtor could be reorganized under Chapter X, and thus the District Court's finding of "good faith" was "clearly erroneous."

In support of this contention, the banks urge that the evidence establishes that (1) the debtor is "substantially insolvent" because it has liabilities of $1,247,873 in excess of its assets of $3,796,204, and, even giving effect to the debtor's appraisal of its investments, its liabilities exceed its assets by $502,709; (2) the debtor "has no working capital for new loans or investments," and "has no prospects of repaying in a reasonable time senior bank debt of approximately $2,000,000 which is in default"; (3) the debtor "has suffered huge losses," and "proceeds of principal assets" are being currently expended; and (4) the debtor "was unable to submit a plan in an [preceding] arrangement proceeding under Chapter XI of the Bankruptcy Act for a period in excess of seven months."

It must be noted at this juncture that the banks opposed approval of the Chapter X reorganization below on the ground that it would delay repayment of their loans, and that in doing so, counsel for the banks stated to the District Court that in his opinion the realizable assets of the debtor would make the banks whole and that "there might be some distribution to the debenture holders who would come next in line."

In reply to the banks' contentions, the debtor and Debenture Holders Committee [5] urge that the evidence supported the District Court's finding that the Chapter X petition was filed in "good faith,"

and that it established "it is most reasonable to expect that a plan [of reorganization] can be effected" in light of the fact that the debtor's holdings have substantially appreciated in value.

Discussion of the stated contentions must be prefaced by this statement:

On November 5, 1969, an involuntary petition in bankruptcy was filed against the debtor, Business Finance Corporation ("BFC"), and a Receiver was appointed.

On November 18, 1969, BFC filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, and the matter was assigned to a Referee in Bankruptcy. On November 19, 1969, the Referee entered an Order authorizing the previously appointed Receiver to operate the business of BFC. It has been in operation ever since. On November 26, 1969, the Referee entered an Order authorizing the Receiver to employ BFC's president, vice-president and treasurer to operate the business. The president and vice-president are still employed at salaries aggregating $45,000 annually.

On January 5, 1970, arrangement schedules were filed, and the Referee entered an Order fixing February 3, 1970 for a first meeting of creditors. At that meeting the Referee fixed April 3, 1970 for filing of BFC's Plan of Arrangement. On April 3, 1970, BFC filed a petition for a 60-day extension of time to file its Plan, stating therein that it had "informally proposed a Plan of Arrangement to its major creditors in an effort to work out a Plan of Arrangement which, when filed will be acceptable to its creditors, and will not require later amendment." The Referee, however, allowed only a 30-day extension to May 4, 1970. A further extension was granted to June 1, 1970, upon BFC's petition stating that its efforts to win approval of the banks of its informally submitted plan of arrangement had proved fruitless and that if given more

5. The District Court granted the Debenture Holders Committee leave to intervene in these proceedings.

time it hoped further efforts in that direction would succeed.

On June 1, 1970, BFC filed the instant petition for reorganization under Chapter X. As earlier stated, its Receiver and Debenture Bondholders Committee joined in the petition. No controverting answers were filed to the petition.

The District Court held a hearing on the petition on June 12, 1970. There was then introduced into evidence an audit ("Report") of BFC and its subsidiary PCGC as of August 31, 1969, made by Laventhol, Krekstein, Horwath & Horwath, certified public accountants. The Report disclosed that the consolidated liabilities of BFC and PCGC totaled $5,803,828 and that their current assets totaled $4,570,771, producing a deficit of $1,233,057. The Report further noted that the management of the debtor BFC, upon review of its consolidated equity investment portfolio, had appraised its value as of August 31, 1969 at $1,477,946—an excess of $745,164 over $732,782 cost. Thus the Report disclosed that if management's August 31, 1969 stated appraisal were given effect the balance sheet deficit of $1,233,057 would be reduced by $745,164 to $487,893.[6]

Julius C. Schwab, president of BFC, testified at the hearing that there had been an appreciation of $1,624,000 in the realizable value of three key investments of BFC and its subsidiary, PCGC during the nine-month interval between the June 1, 1970 filing of the Chapter X petition and the August 31, 1969 Report; he said that the joint investment of BCF and PCGC in Cassidy-Richlar Corporation had a current value of $1,250,000—an increase of $700,000 over its 1969 appraisal of $550,000; the investment by PCGC in the Thomas Holmes Corporation had a current value of $1,100,000—an increase of $609,000 over its 1969 appraisal of $490,745, and, PCGC's investment in the SMS Automotive Products, Inc. had a current value of $500,000—an increase of $315,000 over its 1969 appraisal of $185,000.

In support of the stated value appreciations, Schwab testified as follows:

Cassidy-Richlar Corporation, engaged in the marketing of new products for major companies throughout the United States, earned less than $200,000 in the year ended July 31, 1969, and its earnings for the year ending July 31, 1970 were estimated at $700,000; Thomas Holmes Corporation, a chain retail drug concern, had a net worth of $2,000,000 and was expected to earn $800,000 before taxes in its fiscal year ending August 31, 1970; and SMS Automotive Products, Inc., engaged in the rebuilt auto parts business, was expected to show pre-tax earnings of $200,000 during the current year.

Schwab further testified that he was then engaged, as chief operating officer of the estate, in negotiations for the sale of Cassidy-Richlar; he was asking $6,000,000 and was confident that he could make the sale at $5,000,000, which would yield BFC and PCGC $1,250,000, for their joint 25% interest in the Cassidy-Richlar Corporation. It may be noted parenthetically that at the time of oral argument of these appeals it was disclosed that the BFC-PCGC interest in Cassidy-Richlar had been sold for a consideration substantially in excess of Schwab's $1,250,000 valuation.

Schwab explicitly testified, too, that the Chapter X petition had been filed in good faith and that he sincerely believed that a final plan of reorganization could be worked out in a Chapter X proceeding which would be satisfactory to all parties.

It must be noted at this juncture that the appellant banks did not offer any testimony in rebuttal to that of Schwab as to increased valuations of the three key investments involved.

---

6. The variance between the appellant banks' calculations as to liabilities, assets and deficit in their recited contention, and those above stated, is due to the circumstance that the banks referred only to the accountant's Report insofar as it concerned BFC only instead of the consolidated BFC-PCGC operations.

The District Court upon consideration of the testimony adduced at the June 12, 1970 hearing on the Chapter X petition made the factual finding that it had been filed in "good faith." Implicit in that finding is the District Court's determination that it was not "unreasonable to expect that a plan of reorganization can be effected" within the meaning of Section 146(3) of the Bankruptcy Act, cited herein in footnote 2.

The appellant banks concede on these appeals, as they must, that "a finding of good faith is not to be reversed unless clearly erroneous."

That being so, we are presented, as earlier stated, with the narrow issue whether the District Court's "good faith" finding was "clearly erroneous."[7]

Applicable to resolution of this issue are these well-settled principles:

The burden is on the petitioner to satisfy the bankruptcy court that a Chapter X petition has been filed in good faith.[8]

Good faith imports an honest intention on the part of the petitioner to effect a reorganization, together with a need for and possibility of effecting it,[9] and, in determining whether a Chapter X proceeding was filed in good faith the Court is required only to ascertain whether it was reasonable to expect that a plan could be effected; that there was opportunity and need for reorganization; and that the petition was filed with honest intention of effecting it and not for the purpose of hindering and delaying creditors.[10]

It is unnecessary that the Chapter X petitioner prove at the outset the fairness and feasibility of possible plans of reorganization.[11]

With respect to the good faith requirement of Section 146(3), approval of a Chapter X petition should not be withheld "unless it is abundantly clear that there is no possibility that a plan of reorganization can be effected," and "[a]ny doubt as to whether a plan can be effected should be resolved in favor of the approval of the petition."[12] (emphasis supplied)

An appellate tribunal should use extreme caution in reversing a District Court's "good faith" finding.[13]

Opposition of secured creditors to the granting of a Chapter X petition is not a dispositive factor in determining whether the petition has been filed in good faith nor is it a basis for defeating a Chapter X petition at its inception.[14]

Section 146(3) does not require certainty of a successful plan of reorganization; and there need only be a showing that the petitioner has a basis for expecting that a reorganization can be effected.[15]

Applying the principles stated, we are of the opinion that we cannot say, on review of the record, that the District Court's "good faith" finding was "clearly erroneous."

---

7. York v. Florida Southern Corporation, 310 F.2d 109, 110 (5 Cir. 1962), cert. den. 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963); In re Riddlesburg Mining Company, 224 F.2d 834, 836 (3 Cir. 1955); In re Mifflinburg Body Works, Inc., 205 F.2d 150 (3 Cir. 1953).

8. Marine Harbor Properties, Inc. v. Manufacturer's Trust Company, 317 U.S. 78, 83, 63 S.Ct. 93, 87 L.Ed. 64 (1942).

9. Snyder v. Fenner (In re Central Forging Co.), 101 F.2d 736, 738 (3 Cir. 1939).

10. In re: Julius Roehrs Co., 115 F.2d 723, 724 (3 Cir. 1940).

11. Id.

12. A-Cos Leasing Corporation v. Wheless, 422 F.2d 522, 525 (5 Cir. 1970).

13. Id. at 525.

14. Corr v. Flora Sun Corporation, 317 F.2d 708, 710 (5 Cir. 1963); York v. Florida Southern Corporation, 310 F.2d 109, 110 (5 Cir. 1962), cert. den. 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963).

15. In re: Hunterbrook Building Corp., 276 F.2d 190, 192 (2 Cir. 1960).

The hard core of the appellants' contention is that the record establishes that the debtor is "substantially insolvent" and "that there is no reasonable expectation that the Debtor can be reorganized under Chapter X," because "it has no working capital with which to make new loans or investments."

On the score of their "substantially insolvent" contention, the appellants urge that giving effect to the debtor's appraisal of the value of its investments as of the August 31, 1969 Report, the latter establishes that debtor's liabilities exceed its assets by approximately $500,000. However, in making that contention, the appellants chose to disregard Schwab's uncontroverted testimony at the hearing on the Chapter X petition, that there had been a $1,624,-000 appreciation in the value of the debtor's equity in its investments between August 31, 1969 and the filing of the petition on June 1, 1970. Since, as earlier stated, the excess of liabilities over assets was $487,893 on August 31, 1969, after giving effect to the debtor's then unchallenged appraisal of the value of its equity investments, the $1,624,000 appreciation, in the value of these investments as of June 1, 1970, taken at face value, would operate to eliminate the $487,893 deficit and create a surplus of approximately $1,136,000 of assets over liabilities making the debtor solvent.

The appellants similarly disregarded Schwab's testimony as to the $1,624,000 appreciation in the value of its equity investments, in making their contention "that there is no reasonable expectation that the Debtor can be reorganized under Chapter X."

It cannot be gainsaid that the District Court could accord such weight to Schwab's valuation testimony as it deemed merited, in determining whether it supported the debtor's avowed expectancy of formulation of a plan of reorganization.

This Court has specifically ruled that the value of a debtor's assets is a significant factor in determining whether a Chapter X petition was filed in "good faith."

In doing so, we said:

"The value of the assets when the petition was filed was an important determination with regard to possible reorganization." [16]

This, too, must be said:

The opposition of the appellants to the Chapter X petition was not a dispositive factor in deciding the "good faith" issue.[17]

On the score of that opposition, we must note that it was not joined in by any other creditor of the debtor, and that, moreover, the Debenture Bondholders Committee, which represents 350 holders of $2,800,000 of the debtor's debentures joined in the Chapter X petition, and urged its approval by the District Court. That circumstance, as well as the fact that the Receiver in the Chapter XI arrangement proceeding, joined in the filing of the Chapter X, could well have been considered by the District Court in determining whether the petition was filed in "good faith."

In concluding that we cannot say that the District Court's finding of "good faith" was "clearly erroneous," we have considered and find unsupported by the record the appellants' sweeping contentions that "proceeds of principal assets" have been expended by the debtor, and that the debtor has been guilty of "mismanagement" of its affairs.

For the reasons stated the Order of the District Court of July 6, 1970 approving the instant Chapter X petition will be affirmed.

16. In re: Riddlesburg Mining Company, 224 F.2d 834, 836 (3 Cir. 1955).

17. Wachovia Bank and Trust Company v. Dameron, 406 F.2d 803, 806 (4 Cir. 1969). See, too, cases cited in footnote 14.