**In re HOLI–PENN, INC., Debtor.**

**In re TREWARD REALTY INC., Debtor.**

**Appeal of UNION COMMERCE BANK.**

**Nos. 75–2028 and 75–2029.**

United States Court of Appeals, Third Circuit.

Argued Feb. 10, 1976.

Decided May 13, 1976.

Michael L. Temin, Richard E. Bird, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant.

Leon S. Forman, Earl T. Stamm, Wexler, Weisman, Maurer & Forman, P. C., Philadelphia, Pa., for Republic Mortgage Investors.

Lawrence Mazer, Bogutz & Mazer, P. C., Philadelphia, Pa., for Treward Realty, Inc.

Before ALDISERT, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The Union Commerce Bank ("Bank") appeals from orders approving two petitions filed under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq. (1971).[1] At issue is the finding of the United States District Court for the Eastern District of Pennsylvania that each petition was filed in "good faith." The Bank urges that this finding in each case was clearly erroneous. We agree that the petitions were not filed in good faith and reverse the orders approving the petitions.

---

1. Jurisdiction on appeal is premised on section 24(a) of the Bankruptcy Act, 11 U.S.C. § 47(a) (1971). The two cases are being administered jointly in the district court and were consolidated upon appeal.

## I.

The two debtors and appellees are Treward Realty, Inc. ("Treward"), which holds a lease to a Holiday Inn located at 8900 Roosevelt Boulevard, Philadelphia, Pennsylvania, and Holi-Penn, Inc. ("Holi-Penn"), the sublessee which holds a Holiday Inn franchise and manages the hotel. The issued and outstanding stock of both debtors is owned in its entirety by Treward Associates, a Pennsylvania limited partnership.

In September 1973, Treward and Treward Associates mortgaged the premises at 8900 Roosevelt Boulevard and an adjacent leasehold in consideration for a loan from the Bank of $4,500,000. At that time, Treward owned the real estate, which it promptly sold to Republic Mortgage Investors ("Republic"), a third appellee. Republic, a real estate investment trust, leased back the land upon which the Holiday Inn is located to Treward which lease is subordinated to the Bank's mortgage.

Within six months, Treward ceased making payments on its debt to the Bank. The Bank therefore began an action to foreclose its mortgage in the Court of Common Pleas of Philadelphia County, which resulted in the scheduling of a sheriff's sale for November 1974. Treward and Holi-Penn then filed petitions under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1971).

As both debtors failed to produce plans of arrangement, they were adjudicated bankrupts pursuant to 11 U.S.C. § 776 (1971). The Bank thereupon assumed possession of the property as mortgagee in possession and entered into a management agreement with Penny Wise Motor Inns of America, Inc. ("Penny Wise"), to operate the Holiday Inn. The debtors sought to be reorganized in Chapter X and filed petitions for reorganization on April 30, 1975.

On June 24, the Bank filed a controverting answer to the petitions pursuant to 11 U.S.C. § 544 (1971), attacking the good faith of the petitions on the ground that "it is unreasonable to expect that a plan of reorganization can be effected." After a number of documents were submitted and considered, the district court by order of July 2 approved both petitions, appointed a trustee for the debtors, and enjoined all creditors from enforcing liens on any property owned by or in possession of the debtors or trustee. The Bank was prevented from proceeding with a foreclosure sale on the property which it had scheduled.

The trustee did not take possession immediately. Instead, in his first report to the court filed on August 26, 1975, he stated that he found no objection to the continued management of Penny Wise.

In October 1975, the Bank agreed to allow the trustee to assume possession on or about November 1. The trustee then entered into an agreement with Penny Wise for continued management of the Holiday Inn on substantially the same terms as before.

The Bank has appealed the district court's July 2nd order approving these Chapter X petitions, reiterating its contention that "it is abundantly clear that, on the basis of the appraisals submitted to the court below, there was no possibility that a plan of reorganization could be effected." It is true that no reorganization plan has as yet been developed and no payments have been made to the Bank thus far, bringing the amount owed to it over $5,000,000.[2] Treward and Holi-Penn argue that "the evidence shows a potential property value in excess of the mortgage of the Bank and the evidence establishes good will and going concern values which may feasibly be preserved by reorganization."

## II.

Before a district court may approve a petition filed in Chapter X, it must be satisfied that it was filed in good faith under sections 141 and 144 of the Bankruptcy Act, 11 U.S.C. §§ 541 and 544 (1971).

---

2. We recognize that we must not be governed by developments which have occurred since the time the district court approved the petition when we review its findings. In re Riddlesburg Mining Co., 224 F.2d 834 (3d Cir. 1955).

"Good faith" is defined in section 146, 11 U.S.C. § 546 (1971):

Without limiting the generality of the meaning of the term "good faith", a petition shall be deemed not to be filed in good faith if—

\*    \*    \*    \*    \*    \*

(3) it is unreasonable to expect that a plan of reorganization can be effected . . ..

■ This court has elaborated upon section 146(3) in *In re Business Finance Corp.,* 451 F.2d 829 (3d Cir. 1971). At the outset it emphasized that when a voluntary petition has been controverted, the debtor bears the burden of proving that its filing was made in good faith. *Id.* at 834; *Marine Harbor Properties, Inc. v. Manufacturer's Trust Co.,* 317 U.S. 78, 83, 63 S.Ct. 93, 96, 87 L.Ed. 64, 67 (1942). This burden of proof cannot be met by mere allegations that the debtor can be reorganized; rather, the debtor must show that there is a "reasonable probability or fair assurance of successful reorganization." *In re U.S.A. Motel Corp.,* 450 F.2d 499, 504 (9th Cir. 1971); *accord In re Northeast Corp.,* 519 F.2d 1360, 1363 (4th Cir. 1975). Thus, good faith within the meaning of section 146(3) is absent if liquidation is the only feasible course of action. *Fidelity Assurance Association v. Sims,* 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943).

■ As a basis for effecting a reorganization there must be "good will or going concern value in the business of a debtor which feasibly may be preserved by reorganization for those entitled to it." *In re Julius Roehrs Co.,* 115 F.2d 723, 724 (3d Cir. 1940). Inquiry must thus be made into the value of the debtor's assets. *In re Business Finance Corp., supra,* 451 F.2d at 835; *In re Riddlesburg Mining Co.,* 224 F.2d 834, 836 (3d Cir. 1955); *In re St. Charles Hotel Co.,* 60 F.Supp. 322 (D.N.J. 1945), *aff'd,* 149 F.2d 645 (3d Cir.), *cert. denied,* 326 U.S. 738, 66 S.Ct. 48, 90 L.Ed. 440 (1945).

An analysis of the value of the assets necessarily depends in part upon a calculation of the nature and extent of the debtor's liabilities, a second factor in a section 146(3) determination. *Fidelity Assurance*

*Assoc. v. Sims,* 318 U.S. 608, 616, 63 S.Ct. 807, 811, 87 L.Ed. 1032, 1039 (1943); *In re Hunterbrook Building Corp.,* 276 F.2d 190 (2d Cir. 1960) (per curiam); 6 Collier, Bankruptcy ¶ 6.09 at 1047 (1972). A third factor is the possible earning power of the debtor. 6 Collier, Bankruptcy ¶ 6.09 at 1047 n.26 (1972).

■ Reorganization is not conclusively foreclosed by the opposition of creditors. *In re Business Finance Corp., supra,* 451 F.2d at 834, 835; *In re Bermec Corp.,* 445 F.2d 367 (2d Cir. 1971). Courts in several circuits, however, feel constrained to examine a petition with greater care when it is opposed by substantial creditors, even though their opposition is not dispositive. *In re Northeast Corp., supra,* 519 F.2d at 1362; *In re U.S.A. Motel Corp., supra,* 450 F.2d at 506; *In re Hunterbrook Building Corp., supra,* 276 F.2d at 192; *Janaf Shopping Center Inc. v. Chase Manhattan Bank,* 282 F.2d 211, 215 (4th Cir. 1960).

Although no single factor is determinative of good faith, this court has held that "[t]he value of the assets when the petition was filed was an important determination with regard to possible reorganization." *In re Business Finance Corp., supra,* 451 F.2d at 835, *quoting In re Riddlesburg Mining Co.,* 224 F.2d 834, 836 (3d Cir. 1955). The district court in the instant case took no oral testimony and merely entered an order without opinion on the basis of the documentary evidence before it finding that the petitions were filed in good faith. We believe, however, that the documentary evidence clearly establishes that the district court should not have concluded that there was a reasonable expectation of a successful reorganization of the debtor corporations.

### III.

■ We believe that in the context in which the term is used in Chapter X proceedings, 11 U.S.C. § 544, the finding of good faith is actually the determination of the ultimate fact which is more akin to a mixed conclusion of law and fact rather than a simple factual determination. None-

theless, we recognize that such a finding is ordinarily reviewed subject to the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). *In re Business Finance Corp., supra.*[3]

We note, however, that the district court in *In re Business Finance Corp.* heard testimony in addition to reviewing written evidence. In the instant case, all of the evidence before the district court was documentary. Since we are thus "in as good a position to determine the question as is the district court," we may review the finding of good faith without being constricted by the clearly erroneous rule. *Government of the Virgin Islands v. Gereau,* 523 F.2d 140, 145–46 (3d Cir. 1975); *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d Cir. 1975), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 47 L.Ed.2d 92, 44 U.S.L.W. 3204 (1975).

## IV.

Holi-Penn, in its Chapter X petition, claimed assets of "cash, expendable hotel supplies, a hotel lease and a Holiday Inn franchise having an aggregate value in excess of $100,000." Its total debts were alleged to be over $475,000, or $375,000 in excess of assets. Treward listed its assets as a "long term lease to a Holiday Inn Hotel" with no mention of the value of the lease. Liabilities appear in more detail in Treward's petition as (1) real estate taxes due to the City of Philadelphia in the amount of $98,000; (2) a $4,500,000 mortgage obligation to the Bank; (3) $53,000 owing to a paving contractor; (4) $875,000 owed to Republic on its ground lease; and (5) $33,333.33 monthly rental on another ground lease. Liabilities, assuming an accrued month's rent on the latter ground lease, totaled $5,559,333.33.

The Holiday Inn lease is listed as an asset by both Treward and Holi-Penn. Since their petitions were consolidated by the district court, we will treat their combined assets and liabilities together. The total liabilities of both debtors thus amounted to $6,034,333.33. To determine the total value of their assets is a more difficult matter because the Holiday Inn lease, which is the only asset of any significance, is less susceptible of evaluation.

The debtors submitted two documents to establish the value of the Holiday Inn property. The first is a 1971 appraisal by George Sengpiel of the *proposed* Holiday Inn before construction was begun. He estimated that net revenue in 1973, the first year of operation, would be $849,846 at a 75 percent occupancy rate. Using a capitalization rate of 13.5 percent, Sengpiel arrived at a value of $6,273,310 for the property. His alternative "market approach," based on a comparison of the prices brought by similar properties, yielded a higher value of $6,400,000. We discount and attach little significance to the Sengpiel appraisal because it was highly speculative, computed as it was before the hotel was even constructed, and its projections had proved unrealistic long before the initiation of this Chapter X proceeding.[4]

The second document, a Quality Inns management proposal prepared for Republic, owner of the ground lease, contained figures much lower than the grossly inflated figures of the Sengpiel appraisal. The proposal predicted that Quality Inns managers would be able to produce a net income of $393,276 with 60 percent occupancy in the first year of management, advancing to $541,140 and 70 percent occupancy[5] in the

---

**3.** *See also In re Mifflinburg Body Works, Inc.,* 205 F.2d 150 (3d Cir. 1953); *In re Northeast Corp., supra,* 519 F.2d at 1363; *In re U.S.A. Motel Corp., supra,* 450 F.2d at 503.

**4.** Net income for the Holiday Inn from April 1974 to March 1975 was calculated as $46,000 by the accountant's report for Penny Wise. Sengpiel predicted an income about eighteen times greater than that for the Inn's first year of operation.

**5.** This projected occupancy is 1.6 times the actual average occupancy rate of 43.4 percent estimated by the accountant's report for Penny Wise.

We note that in the first report of the trustee in this case he advised the court that the estimate of "required occupancy to convert a loss into profit or break even is 62%." Attached to

third year. The average net annual income thus projected is about half that estimated by Sengpiel, but still almost nine times greater than the Holiday Inn's actual income from April 1974 to March 1975 as reported by Penny Wise's accountant's statement. The Quality Inns proposal also apparently overlooked a number of expenses, conceded at oral argument in this court to amount to about $90,000. We cannot ignore these expenses and must reduce the projections of net income contained in the management proposal to reflect them.

After subtracting the omitted expenses of $90,000, we arrive at a predicted net income of $303,276 in the first year, up to $451,140 in the third. The management proposal itself contemplates an additional expenditure to be made by the debtors of $75,000 in order to upgrade the rooms over three years. Deducting one-third of this amount from each year's estimated income reduces the projected incomes to $278,276 and $426,140. Working capital of about $59,000 must be furnished to implement the management proposal. However, this amount might not be taken out of income since Republic submitted an affidavit in support of the Quality Inns management proposal indicating its willingness to advance up to $50,000 toward implementation of the proposal. We do not, therefore, deduct it from income.

A capitalization rate of 13.5 percent, which was used in appraisals submitted by both the Bank and the debtor, applied to the new reduced estimates in the management proposal results in a low value of $2,061,303.70 and a high value of $3,156,-592.59. The average value is $2,608,948.15. These projections rest upon an assumption that Quality Inns management could deliver an income at much greater levels than those which were being achieved by Penny Wise's management under the Holiday Inn

franchise. The need to accept this premise divests the estimates of some of their force.[6]

The Bank, for its part, submitted an appraisal produced by Appraisal Affiliates, Inc. which estimated the successful operation of the Holiday Inn at 60 percent occupancy could produce a net annual income of $344,500. Capitalized at the rate of 13.5 percent, the property is worth $2,550,000. The appraisal estimated the furnishings at $475,000, for a total value of $3,025,000.

In addition, the Bank submitted projections of income and expenses prepared by Laskaris and DeLuca, a hotel accounting and auditing firm, for Penny Wise in June 1975. The projections of income were based on a range of assumed occupancy rates. Before deducting for debt service and provision for replacements, the projected net income at 55 percent occupancy was $274,000; at 60 percent, $337,000; and at 65 percent, $395,000. The report noted that the average occupancy rate over the preceding twelve months was 43.4 percent. However, the rate was down to 33.7 percent in February 1975 and 37 percent in March 1975.

A projection of 60 percent occupancy was used by Appraisal Affiliates in its report and by Quality Inns for its first year of management. At that rate Laskaris and DeLuca predict an income of $337,000. Capitalized at 13.5 percent, their projection yields $2,409,629.63 value for the property.

The estimates of value for the Holiday Inn property center on the figure of $2,500,-000, once we discount, as we must, the Sengpiel appraisal. If the value of furnishings, pegged by Appraisal Affiliates at $475,000, is added to this sum, a rounded figure of $3,000,000 results. Since the leasehold is the only asset of substantial

---

his report was a special report of the average rate and occupancy of hotels and motels in the Philadelphia area showing that, in 1974, over a third of the listed establishments operated below a 62 percent occupancy rate and, as of June 1975, over half of the listed establishments were operating below that rate.

6. The trustee's first report to the court supports our skepticism. The trustee stated that he "finds no objection to the management of Penny Wise Motor Inns of America, Inc., who have been accomplishing many of the suggestions made by Rex E. Dalrymple, Vice President of Quality Inns International, Inc."

value which the two debtors can claim, we conclude that their assets are worth approximately three million dollars.

Their liabilities far exceed this amount. The Chapter X petition of Treward fixes the amount due on the mortgage to the Bank at $4,500,000. In its brief to this court, the Bank cites the affidavit of its Vice President, submitted to the district court before approval of the petition, averring a total outstanding balance of principal and interest as of May 1, 1975, of $5,152,-819.56. Other liabilities total over one million dollars. Thus, combined liabilities exceed the most reasonable estimates of the value of the debtors' assets by three million dollars.

Earning power is similarly deficient.[7] Even the most optimistic forecast by the debtors falls short of meeting the debt service to the Bank of $453,600 annually by over $27,000. The more realistic income ranges projected by both the Bank and the debtors are in the range of $300,000 to $350,000, which fall some $100,000 to $150,000 short of debt service costs.

We suspect that there were basic errors in the concept of this whole enterprise. Within six months after the Holiday Inn commenced operations, Treward defaulted on its mortgage obligations. The debtor, Holi-Penn, has not successfully operated the business for any period of time to develop any good will as a going concern. In these circumstances, there is no evidence from which to posit any value in the business of these debtors which could be preserved by a reorganization. No testimony appears in the instant case, as existed in *In re Business Finance Corp., supra*, that the assets had appreciated in value from the time of the filing of the petition to the date set for approval.

## V.

Chapter X reorganizations are intended as a remedial device for the rehabilitation generally of large and publicly held corporations. *S.E.C. v. American Trailer Rentals Co.*, 379 U.S. 594, 613, 85 S.Ct. 513, 523, 13 L.Ed.2d 510, 521 (1965); *In re U.S.A. Motel Corporation, supra*, at 505. The Bank has raised the propriety of invoking Chapter X proceedings to these small, closely held debtor corporations. We do not need to decide this issue because we are persuaded that the actual purpose of this Chapter X proceeding is not rehabilitation of the debtor corporations and preserving the going concern value of the property, but is an effort by Republic to delay the first mortgagee in its foreclosure proceedings.[8] Chapter X proceedings should not be utilized merely to resolve disputes between or improve tactical positions of lien creditors *inter sese*.

For a period in excess of 16 months prior to the filing of the petition, no payments had been made on the obligation to the Bank. The Bank's debt has increased substantially since the filing of the petition, and there is some indication that its mortgage security has been impaired. No plan for an arrangement of the debtors was developed during the Chapter XI proceedings initiated on October 31, 1974. No plan for their reorganization has been developed since the filing of the Chapter X proceedings. The record of earning power of the debtor corporations at the time the petitions were filed was insufficient to cover their debt service, not to mention payments on the ground leases or their tax arrearages. Except for the bare allegations in the petitions, little substance was offered to support the prospects of reorganizing the debtors as viable corporations. The record

---

7. At a capitalization rate of 13.5 percent, a net income of $695,630 would be required to produce a market value equal to the debt of $5,152,819 owed the Bank as of May 1, 1975. No projections have been submitted approximating this amount of net income.

8. The Bank instituted its foreclosure proceedings in the state court in October 1974. A

sheriff's sale of the premises was scheduled for November 4, 1974. Treward's Chapter XI petition stayed the sheriff's sale pursuant to Rule 11–44 of the Rules of Bankruptcy Procedure. The property was rescheduled for sale on August 4, 1975 but the district court enjoined this sale upon the application of Republic.

also discloses that the property was worth considerably less than the amount of the Bank's first mortgage. The likelihood of a successful reorganization without a large infusion of capital was fanciful. We believe nothing in this case establishes a fair assurance that a successful plan of reorganization could have been effected.

Of the total debt owing the creditors of about $6,209,333.33, in excess of $5,150,000 is owing to the Bank on its first lien. The Bank, with a debt exceeding many times the aggregate debt of all general creditors, has been immobilized for too many months from pursuing its contractual remedies under the mortgage. A first mortgagee-creditor, especially one whose debt comprises the overwhelming bulk of the debtor's aggregate liabilities, should not be kept in cold storage indefinitely while its security erodes, in the faint hope that some miracle may happen. We have no difficulty in reaching the definite and firm conviction that the Chapter X petitions were not filed in good faith.

The order of the district court approving the petitions of Holi-Penn Inc. and Treward Realty, Inc., will be reversed. Upon remand, the petitions will be dismissed.